STABLE ENERGY, L.P. and Anchor
Operating Company, Appellants,

v.

KACHINA OIL & GAS, INC.; Bank of
America, N.A. (Successor in Interest
to NationsBank of Texas, N.A.), as
Trustee u/w/o John Murchison, a/k/a
the John C. Murchison Trust; Torch
Energy, Inc.; Edmund Kappler; and
Ruben Kappler, Appellees.

No. 03–00–00308–CV.

Court of Appeals of Texas,
Austin.

June 29, 2001.

Lee S. Gill, Kilburn, Jones, Gill & Campbell, L.L.P., David A. Furlow, Houston, for Appellants.

J. Robert Goldsmith, Jr., Karen Bogisch, Goldsmith & Bogisch, Austin, for Appellees.

Before Justices KIDD, B.A. SMITH and PURYEAR.

KIDD, Justice.

Appellants, Anchor Operating Company and Stable Energy, L.P. (collectively "Stable") seek the reversal of a final judgment entered in favor of appellees (collectively "Kachina") regarding the ownership interests and rightful operator of an oil and gas well in Fayette County. Because we conclude that Stable failed to prove it acquired a majority interest in the well, we will affirm the district court judgment.

## THE CONTROVERSY

This case involves a dispute over the ownership and operation of the Triangle K No. 1 Well in Fayette County ("the well"). In 1980, the original owners of the well entered into a joint operating agreement ("JOA") and designated CRB Oil & Gas as the operator. In the following years, the title of "operator" changed hands several times and eventually became the focal point of the parties' dispute. In 1983, CRB delegated the operation of the well to K–N Operating on a subcontract basis. A few years later, CRB filed for bankruptcy. The chapter 7 trustee executed a Texas Railroad Commission Form P–4 designating K–N as the operator. In 1990, K–N executed another Form P–4 designating its affiliate, MGN Oil & Gas Corporation, as the operator. In 1991, MGN changed its name to Kachina Oil & Gas, Inc., one of the appellees. Although the original operator, CRB, owned a working interest in the well, the succeeding operators, K–N and MGN/Kachina, had no working inter-

est when they were designated as operator.

In 1989, Pampell Interests became a party to the JOA by purchasing a minority interest in the well at a foreclosure sale. Subsequently, Pampell Interests was merged into Stable Energy.[1] Stable and Anchor, the appellants, are affiliates and were owned and controlled by a single individual, the late Alfred W. Pampell.

The JOA governs the contractual relationship of the owners of the well. It designates management of the contract area to the operator, who sends monthly bills to the working interest owners for their share of the costs ("joint interest billings"). The JOA grants the operator a lien on the interests of any party in default on their joint interest billings. Prior to any major operations, such as drilling a new well or reworking an existing one, the operator is required to present a detailed proposal of the project to the working interest owners in an authorization for expenditure ("AFE"), requesting contributions from the owners. The JOA penalizes those who choose not to participate with relinquishment of their interests in that well upon commencement of the proposed operation.

In September 1992, Kachina sent an AFE notifying the working interest owners that the well had ceased production and that the lease would terminate if production did not resume. The AFE proposed a workover operation to clean the wellbore and requested the participation of the owners. Stable consented to the project and delivered its share of the costs. In addition, Stable later agreed to assume the costs attributable to the parties who had elected not to participate ("non-consenting parties"). At this point, Stable already held a thirty-three percent interest in the well, and the non-consenting parties held approximately a twenty-eight percent interest. On November 19, 1992, Stable mailed a second check to Kachina with the written condition that the check only be applied to Stable's "purchase of its portion of the ... non-consent interest." However, Stable was already in default on its joint interest billings for the well, and Kachina advised Stable that it was undecided how to apply the monies it had on hand from Stable. Consequently, Kachina retained the funds in an escrow account.

Although Stable sent checks for the proposed project, Stable and Kachina were in dispute at the time regarding operation of the well and Stable's past due joint interest billings. Throughout November 1992, Stable's attorneys corresponded with Kachina, expressing disapproval of Kachina's proposed project and threatening to sue. Stable claimed that it was the operator and would take control of the well. On November 25, 1992, Kachina obtained an extension on the lease, which was on the verge of expiration, to gain time to resolve these issues with Stable. On or about that same day, Stable's affiliate, Anchor, cut the locks from the gate and took possession of the well. For several weeks, Anchor conducted an acid workover on the well to access new reserves. With Anchor in possession of the well, Kachina withdrew its AFE on or about December 10, 1992.

Stable filed suit in December 1992, seeking an accounting and declaratory judgment that Anchor was the operator. In response to the request for an accounting, the trial court appointed a master and subsequently signed an order pursuant to

---

1. Both Stable Energy and its predecessor, Pampell Interests, will be referred to as "Stable."

the master's report. In January 1994, the district court rendered a final summary judgment in favor of Kachina. This Court reversed and remanded for further proceedings.[2] On remand, Stable additionally requested damages, and Kachina responded with a request for declaratory judgment and payment of Stable's delinquent joint interest billings. The district court conducted a bench trial and rendered a final judgment in favor of Kachina. The court failed to find that Stable acquired ownership of the non-consent interests and that Anchor was the lawful operator of the well. The court awarded Kachina its attorney's fees and sums for past due joint interest billings against Stable and Anchor. In satisfaction of the amounts awarded, the court ordered Kachina's lien against Stable's interests in the well foreclosed. Stable seeks reversal of the judgment and reimbursement for reworking the well.

## DISCUSSION

### Standard of Review

■ After conducting a bench trial, the trial court issued findings of fact and conclusions of law. Stable challenges several findings and the legal and factual sufficiency of the evidence supporting the judgment. When reviewing a verdict to determine the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L.Rev. 515 (1991) [hereinafter Powers]. Appellant's legal-sufficiency argument is a "conclusive evidence" point of error: appellant attempts to overcome, as a matter of law, an adverse fact finding on an issue for which it had the burden of proof. To resolve such a point, we must ask whether there is no evidence to support the finding. If there is no evidence to support the finding, we must then examine the entire record to see if appellant's contrary proposition is established as a matter of law. A party establishes a proposition as a matter of law if reasonable minds would not differ in drawing the same conclusion. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex. 1989); *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982); *see* Powers, 69 Tex. L.Rev. 518, 523.

### Ownership and Operation of the Well

■ Under the JOA, ownership of the well can shift when parties elect not to participate in an operation. The non-consenting parties relinquish their interests in the well to the consenting parties who perform the operations. In addition, the JOA dictates the method for choosing or changing operators. The JOA declares that the operator must have an ownership interest; if not, then the operator can be replaced. To do so, however, the owners must select a successor operator by majority vote. Stable claims to have acquired a majority interest and elected Anchor as successor operator under these procedures.

Stable first contends that the trial court erred in ruling that Stable failed to prove it acquired a majority working interest in the well. Initially in 1989, Stable acquired a thirty-three percent interest in the well. In 1992, Kachina sent the AFE for the workover, receiving the consent of some

**2.** *Anchor Operating Co. & Stable Energy, L.P. v. Kachina Oil & Gas, Inc.,* No. 03–94–00254– CV (Tex.App.—Austin June 21, 1995, no writ) (not designated for publication).

owners, but not all. Kachina notified Stable that an approximate twenty-eight percent interest, owned by the non-consenting parties, was available if Stable chose to assume those interests. Kachina stated in a letter that Stable's "payment of $4478.21 will earn [Stable] an additional .2798881 interest in the well." In response, Stable sent Kachina a check for that amount with the written condition that the funds only be applied to purchase of the non-consent interest. Stable points to this transfer of funds as the moment when Stable became the majority interest owner in the well. Stable claims that the non-consenting parties relinquished their twenty-eight percent interest upon tender of this check, bringing Stable's total ownership interest to approximately sixty-one percent.

Relinquishment of non-consenting interests is governed by article VI.B.2 of the JOA: *"Upon commencement of operations for the ... reworking ... of any such well by Consenting Parties ... each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties ... all of such Non–Consenting Party's interest in the well and share of production therefrom."* (Emphasis added.)

Thus, the JOA does indeed provide that the parties who choose not to participate in the project forfeit their interests in the well. However, this provision specifies that relinquishment occurs upon commencement of operations. Contrary to Stable's contention that tender triggered relinquishment, the JOA mandates that ownership of non-consent interests could not have transferred to Stable until—at the earliest—the date when the workover began. *See Abraxas Petroleum Corp. v. Hornburg,* 20 S.W.3d 741, 754–55 (Tex. App.—El Paso 2000, no pet.).

For this reason, only actual commencement of Kachina's proposed project could have triggered relinquishment of the non-consent interests. Kachina itself withdrew the AFE and never began the operation. Stable argues that the project proposed by Kachina commenced when Anchor seized the well and performed an acid workover. However, Anchor's activities only constituted a legitimate commencement if (1) the operations performed were the *same* as those described in the AFE, and (2) the operations were performed by a duly elected operator.

### 1. *Operations Performed*

■ Article VI.B. requires that operations be preceded by an AFE requesting approval from the owners. The AFE must inform owners of the "location, proposed depth, objective formation and the estimated cost" so that they may decide whether to participate. In the instant case, the non-consenting parties, whose interests Stable hoped to acquire, had declined to approve the AFE sent by Kachina. That is the project in which those parties elected not to participate and consequently made their interests vulnerable to relinquishment. For Kachina's AFE to cover the operations performed by Anchor, the operations must be as described in that AFE and as declined by the non-consenting parties.

Stable argues that the workover Anchor performed was *substantially similar* to Kachina's proposal because both can be labeled a "workover." However, Kachina did not merely obtain approval from the parties for a "workover." The AFE specified mechanics and costs that varied substantially from the operations Anchor performed. Documents put into evidence and the experts' testimony indicate that the Anchor operation was designed to open new productive zones, rather than to merely clean existing perforations, as Kachina had planned. Anchor's operation required over twice as much acid, and the cost

incurred (over $33,500) was more than twice the cost proposed by Kachina ($16,-000). Stable's own witness, Frank Klepper, an expert on oilfield operations, described Kachina's proposal for a "5,000 gallon acid job" as a "very small . . . clean-up acid job." In contrast, Mr. Klepper stated that Anchor's project was designed to "open some new zones . . . open up more of the reservoir," which "required the bigger acid job." He stated Kachina's proposed operation "was different from [Anchor's] actual operation," and the two could not properly be described as "identical." William Newberry, Kachina's former officer, testified that Kachina intended to restore the well to reasonable production while a horizontal well was arranged. Kachina did not intend to perforate the well in a new zone, as done by Anchor. The evidence establishes that Kachina's AFE did not cover Anchor's activities because they were substantially different from the workover proposed by Kachina.

Stable suggests these divergences are insignificant because the operator may substantially exceed the estimate made in an AFE. Stable relies on the testimony of Newberry, who admitted that Kachina could have exceeded the cost estimated by the AFE *in an emergency*. Yet the rest of Newberry's testimony indicated that the operator usually cannot exceed an AFE without permission. He explained that with "issues of significance we would have . . . needed additional approval from the participants short of an emergency." He explained that with "a long weekly fishing job, spending thousands" beyond the AFE, he "would stop and get approval."

Indeed, if non-consenting parties are going to forfeit their interests, it is essential that the operation triggering that forfeiture is the same one the parties rejected. The evidence here is factually and legally sufficient to establish that Anchor's project

differed substantially from Kachina's proposal. Because Anchor's operations differed from those proposed by Kachina, actual commencement of Kachina's AFE never occurred, and the JOA relinquishment clause was not triggered. This alone was enough to prevent Stable from gaining a majority interest.

2. *Operator Status*

Second, legitimate commencement of the AFE must be executed by the duly elected operator. Only the operator has the power to perform such operations on behalf of the owners. Article VI.B. of the JOA requires that the "[o]perator shall perform all work for the account of the Consenting Parties." Article V.A. provides that the operator shall have full control of all operations.

Stable argues that the trial court erred in holding that Anchor was not the legal operator. Stable emphasizes that, although Kachina was *acting* as operator, it did not own a working interest in the well as the JOA requires of the operator. Therefore, the owners of the well could replace Kachina with a successor operator by majority vote. Anchor and Stable contend that together they were able to constitute that majority vote and elect a successor operator. They assert that Stable gained a majority working interest in the well by transferring funds for the non-consent interest. This would have brought Stable's interests to approximately sixty-one percent. Stable contends that on November 2, 1992, Stable assigned a one percent interest in the well to Anchor. This made Anchor eligible to become the operator in accordance with the JOA's requirement that the operator own a working interest. Acting on the assumption that together they constituted a sixty-one percent majority, Stable and Anchor voted to remove Kachina and substitute Anchor as operator. That same day, Anchor

seized the well. In essence, Stable and Anchor argue that their possession of a majority interest, in combination with Kachina's questionable status as operator, enabled them to elect Anchor as the successor operator.

Stable correctly contends that Kachina was vulnerable to being replaced by a successor operator because, at the time of Anchor's alleged election, Kachina did not own a working interest in the well. The JOA provides that operators "shall be selected from the parties owning an interest in the Contract Area." Because Kachina was not a partial owner, Article V.B.1 of the JOA would have allowed the parties to replace Kachina with a successor operator: "If Operator ... *no longer owns an interest in the Contract Area* ... it shall cease to be Operator without any action by Non Operator, *except the selection of a successor.*" (Emphasis added.)

■ Whether Anchor and Stable could have executed such a selection is governed by Article VI.B.2, which provides that "the successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership." This provision requires that Anchor and Stable owned a majority interest in the well *prior* to electing Anchor as the successor. However, they did not own a majority interest; they owned only thirty-three percent. Stable could not have acquired the additional interests until *after* commencement of operations, as required by the JOA relinquishment clause. Yet Stable and Anchor claim that they elected Anchor as operator *prior* to seizing the well and commencing operations. For that reason, the election of Anchor was

ineffective. Any vulnerability in Kachina's position was immaterial because Stable and Anchor did not have the majority interest required to elect a successor without the consent of the other parties.[3]

Therefore, because the operations performed differed substantially and Anchor was not the lawful operator, activities performed by Anchor did not constitute a legitimate commencement of the operations proposed by Kachina's AFE. As a result, the non-consent interests were never relinquished and could not be acquired by Stable. Thus, we conclude that Stable failed to prove it acquired a majority interest, the court's ruling that Anchor was not the lawful operator is correct.

### 3. *Stable's Alternative Theories*

■ Although Stable did not acquire owner/operator status pursuant to the JOA, Stable also offers alternative theories of recovery. Stable points to a letter it received from Kachina regarding the non-consent interests. The letter advised Stable that "Kachina must receive [Stable's] payment of $4478.21 for its part of the non-consent interest in the Triangle K # 1 workover. [Stable's] payment of $4478.21 will earn it an additional .2798881 interest in this well." Stable argues that this letter created some entitlement to recovery because it contains an assurance that Stable would acquire the interests.

Stable suggests that this letter is a basis for estoppel regarding application of its check. Stable argues that not only did Kachina promise in the letter to apply any funds to the non-consent interests, but it also deposited the check from Stable, which was limited to that purpose per a

**3.** Kachina also argues that, even if Stable had acquired a majority interest in the well, the non-consenting parties retained a right to vote on the succession of the operator. *Hill v. Heritage Resources, Inc.,* 964 S.W.2d 89,

111 (Tex.App.—El Paso 1997, pet. denied). Because we affirm the trial court's judgment on other grounds, we need not address this issue.

written condition. Stable argues that estoppel therefore prevents Kachina from claiming to have applied the money otherwise. However, the funds from Stable were never applied toward the non-consent interests. Kachina initially retained the funds in an escrow account. Early in the suit, the trial court appointed a master to review the accounting of the parties. Pursuant to the master's recommendation, the court ordered that the funds be applied toward Stable's delinquent joint interest billings. Therefore, Stable's estoppel theory fails because the funds were applied to Stable's past-due indebtedness by court order and not as a result of Kachina's conduct.[4]

■ Nor does Kachina's letter confer upon Stable any rights to the non-participants' ownership interests. Even if we interpret the letter as promising relinquishment upon payment, that promise would have conflicted with the JOA's "upon commencement" clause. Any modification attempted by Kachina and Stable to the relinquishment clause of the JOA would not have been binding without the consent of the other parties to the contract. *See Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 228–29 (Tex.1986). The record contains legally and factually sufficient evidence from which the trial court could conclude that Stable failed to prove it acquired a majority interest or that Anchor was the legal operator. We overrule Stable's first point of error.

### Reimbursement for Workover Costs

■ Stable also argues that the trial court erred in refusing to reimburse it for the $33,500 Anchor spent reworking well. To recover this expenditure under the JOA, Stable was required to comply with its terms. The JOA, however, only provides reimbursement for workover costs to the *operator*. Under Article V.A., the op-

erator "has full control of all operations." The operator alone is entitled to perform operations on behalf of the consenting parties and bill them accordingly. The JOA also requires, under Article VI.B., that any projects undertaken by the operator be preceded by an AFE soliciting participation of the owners. Under the second paragraph of the "Accounting Procedure," an attachment to the JOA, the operator must send monthly joint interest billings to keep the owners abreast of costs. Thus, to recover under the JOA, Anchor was required to be the legitimate operator, obtain approval from the other parties, and send monthly joint interest billings. Anchor did not comply with these requirements. As previously discussed, Anchor was never the duly elected operator under the terms of the JOA. In addition, Anchor did not request the approval of the parties with an AFE proposing its specific operations. The AFE sent by Kachina did not transfer to Anchor's project because the two types of workovers differed significantly. Finally, Anchor also failed to provide monthly joint interest billings to inform the owners of costs. The activities performed by Anchor do not satisfy the JOA's provisions for reimbursement to the operator.

■ Although Stable did not establish its right to reimbursement under the JOA, it alludes to other theories of reimbursement as well. Stable suggests recovery under *quantum meruit* by arguing that it conferred a benefit to the other owners when Anchor conducted the workover. To establish a claim under *quantum meruit*, Stable must establish that (1) it rendered a valuable service to the owners of the well, (2) the owners accepted and benefitted from the workover, and (3) the owners reasonably would have known that Stable expected payment. *See Sourignavong v. Methodist Healthcare Sys. of San*

---

4. Promissory estoppel as a general theory of     recovery is discussed below.

*Antonio, Ltd.*, 977 S.W.2d 382, 385 (Tex. App.—Amarillo 1998, pet. denied) (citing *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex.1985)). Stable claims that production resumed after the workover, but fails to present evidence regarding the reasonable value of the benefit allegedly received by the owners. Thus, Stable has not pled or proven the elements of *quantum meruit.*

■ Stable also suggests it deserves reimbursement under a theory of promissory estoppel. Stable urges that Kachina represented in its letter that Stable's payment would acquire the non-consent interests. Stable alleges that the letter induced Stable to rely on the letter to Stable's detriment.

■ To enforce a representation by promissory estoppel, the first requisite is an actual promise. *See Aubrey v. Workman*, 384 S.W.2d 389, 393 (Tex.Civ.App.—Fort Worth 1964, writ ref'd n.r.e). Although the letter represents that Stable's payment will acquire the additional interests, it does not promise that transfer of interests will occur upon *tender of payment.* The JOA specifies that relinquishment occurs upon *commencement* of the project. Kachina's letter can reasonably be construed as consistent with the JOA, truthfully predicting that Stable would acquire the interests if the proposed workover went forward.

■ Regardless, no estoppel arises if Stable was as well informed as Kachina regarding the relinquishment of non-consent interests. *See Barfield v. Howard M. Smith Co.*, 426 S.W.2d 834, 838–39 (Tex. 1968). Anchor was a party to the JOA and had a duty to be familiar with its terms, including the relinquishment clause. *See Farina v. Calvary Hill Cemetery*, 566 S.W.2d 650, 652 (Tex.Civ.App.—Texarkana 1978, writ ref'd n.r.e.). If an alleged promise is part of a valid contract, the promisee cannot disregard the contract and sue for reliance damages under the doctrine of promissory estoppel. *Guaranty Bank v. Lone Star Life Ins. Co.*, 568 S.W.2d 431, 434 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.). Stable has not pled or proven the elements of promissory estoppel.

Legally and factually sufficient evidence supports the trial court's denial of reimbursement. Compensation is not justified under the JOA or any other theory relied upon by Stable. We overrule Stable's second point of error on the reimbursement of workover costs. Because all of the rulings were supported by sufficient evidence, we also overrule Stable's third point of error.

### *Attorney's Fees*

■ Stable argues that this Court should reverse the award to Kachina for attorney's fees if it reverses the trial court's declaratory judgment. However, in light of our affirmance, we conclude the award to Kachina for attorney's fees was reasonable. The Texas Uniform Declaratory Judgments Act provides: "In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." Tex.Civ.Prac. & Rem.Code Ann. § 37.009 (West 1997). "The granting or denial of attorney's fees in a declaratory judgment action is within the trial court's discretion." *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex.1996). Both the award to Kachina and the denial of an award to Stable for attorney's fees were within the discretion of the trial court. We overrule points of error four and five.

### CONCLUSION

Having overruled all of Stable's points of error, we affirm the trial court's judgment in all respects.