**Joe W. DIMOCK and E.W. Moran Drilling Company, Appellants,**

v.

**Louise KADANE, Michael L. Gustafson, and Carr Staley as Co–Trustees of the Louise Trust; Mark W. Gray; and Michael L. Gustafson, Appellees.**

**No. 11–01–00352–CV.**

Court of Appeals of Texas, Eastland.

March 6, 2003.

Rehearing Overruled April 10, 2003.

Jess N. Turner III, Turner & Allen, Graham, Joe W. Dimock, for appellants.

John M. Key, Russell, Leonard & Key, Wichita Falls, Michael Gustafson, Mark Gray, for appellees.

Panel consists of ARNOT, C.J., and WRIGHT and McCALL, JJ.

## OPINION

W.G. ARNOT, III, Chief Justice.

Joe W. Dimock (Dimock) and E.W. Moran Drilling Company (Moran) brought this partition action against Louise Kadane, Michael L. Gustafson, and Carr Staley as Co–Trustees of the Louise Trust (the Kadane Defendants); Mark W. Gray; and Michael L. Gustafson.[1] Dimock, Moran, and the Defendants are tenants in common in oil and gas leases. In the trial court, Dimock and Moran sought a partition by sale of the parties' undivided interests in the leases. The Kadane Defendants filed a counterclaim for declaratory judgment. They asserted that the prior owners of the undivided interests in the leases impliedly waived the right to partition under the terms of a Basic Agreement and an Operating Agreement (the Agreements) and that, therefore, Dimock and Moran were not entitled to partition. The trial court granted summary judgment and rendered judgment in favor of the Kadane Defendants on their declaratory judgment action and awarded them attorney's fees.[2] Because the prior owners of the oil and gas leases impliedly agreed not to partition their interests in the leases, the trial court properly granted summary judgment to the Kadane Defendants. Dimock and Moran appeal from the trial court's judg-

ment denying them partition. We affirm the judgment of the trial court.

This suit involves 11 oil and gas leases in the Robert Richards Ranch Units Nos. 2 through 8 and 10 in Palo Pinto County, Texas. On August 3, 1973, G.E. Kadane & Sons (Kadane & Sons) and Texas Utilities Fuel Company (TUFCO) entered into the Agreements for the purposes of exploring and developing nine oil and gas prospects in Palo Pinto County, Texas. Kadane & Sons acquired the oil and gas leases in question during the years 1973 through 1979. Under the terms of the Basic Agreement, TUFCO acquired 50 percent of Kadane & Sons' interest in the leases. In 1996 and 1997, Dimock purchased his interests in the subject leases from TUFCO, the Mike Kadane Trust, the Estates of Edward G. Kadane and Hannah J. Kadane, and Kadane Oil Company. Moran also acquired interests in the leases. Dimock, Moran and the Kadane Defendants agree that the leases are subject to the Agreements.

■ In their first five points of error, Dimock and Moran assert that the trial court erred in granting summary judgment to the Kadane Defendants. In its judgment, the trial court made a finding that:

> Having examined the particular terms, provisions and conditions of The Agreements, the Court finds that as a matter of law the parties impliedly waived the right to a compulsory partition of The Subject Lands and Plaintiffs may not compel a partition of The Subject Lands either in kind or by sale.

---

1. Dimock and Moran also asserted a trespass to try title claim. The trial court entered an agreed order severing the trespass to try title claim from this action.

2. The trial court made Mark W. Gray and Michael L. Gustafson parties to the judgment by separate order.

■ Joint owners of undivided mineral interests have the statutory right to compel partition under TEX. PROP. CODE ANN. § 23.001 (Vernon 2000). See *MCEN 1996 Partnership v. Glassell*, 42 S.W.3d 262, 263 (Tex.App.-Corpus Christi 2001, pet'n den'd). However, joint owners may expressly or impliedly agree not to partition. *MCEN 1996 Partnership v. Glassell*, supra at 263; *Long v. Hitzelberger*, 602 S.W.2d 321, 324 (Tex.Civ.App.-Eastland 1980, no writ); *Lichtenstein v. Lichtenstein Building Corporation*, 442 S.W.2d 765, 769 (Tex.Civ.App.-Corpus Christi 1969, no writ). There is no express agreement not to partition in the Agreements. Therefore, the issue is whether Kadane & Sons and TUFCO impliedly agreed not to partition the mineral interests.

■ In order to determine whether the parties impliedly agreed not to partition, the courts "examine the particular contract involved and from the provisions thereof determine whether or not the parties impliedly contracted against partition." See *Warner v. Winn*, 191 S.W.2d 747, 751 (Tex.Civ.App.-San Antonio 1945, writ ref'd n.r.e.). In this context, courts have considered various types of contractual provisions in drilling contracts. For example, if a joint owner of a mineral interest contracts to pay his proportionate part of expenses of drilling and development of the premises for oil and gas, that owner "cannot demand a partition of the mineral estate so as to work a cancellation of the drilling contract, and thereby relieve himself of his proportionate part of the expenses of developing the lease." *Sibley v. Hill*, 331 S.W.2d 227, 229 (Tex.Civ.App.-El Paso 1960, no writ); *Elrod v. Foster*, 37 S.W.2d 339, 342 (Tex.Civ.App.-Austin 1931, writ ref'd). Additionally, "when parties contract for the drilling of wells, and such drilling is either made the consideration for the transfer of a mineral estate or is necessary to extend or perpetuate a lease, it must be inferred that the parties to the drilling agreement did not intend for the estate to be partitioned." *Long v. Hitzelberger*, supra at 323; *Warner v. Winn*, supra at 751. In *Sibley*, the court determined that a provision in an operating agreement giving the parties a preferential right of purchase coupled with a provision that the agreement was to be in force for so long as oil, gas, or other minerals were produced indicated a "clear implication that the absolute right of partition had been contracted away." *Sibley v. Hill*, supra at 229. However, "it can hardly be said that each and every covenant or provision relating to property held in common carries with it the implication that no partition shall be had." *Warner v. Winn*, supra at 751. For example, in *Warner*, the court held that an agreement to manage and operate the properties after the completion of the drilling program, without more, was not sufficient to imply an agreement against partition. *Warner v. Winn*, supra at 751.

We, therefore, examine the provisions of the Agreements. In Paragraph No. 2 of the Basic Agreement, Kadane & Sons and TUFCO agreed to drill a total of three test wells in the nine prospects. They agreed that Kadane & Sons, as the operator, would drill the test wells during the primary term of the leases in the three prospects at "TUFCO's cost and expense to the point of determination of running a production string of casing (if an attempt was made to complete the well as a commercial producer), or plugging and abandonment." If they agreed that a completion attempt should be made on any of the test wells, they would pay their pro rata portion of any completion costs, according to their respective working interests. In Paragraph No. 6 of the Basic Agreement, Kadane & Sons and TUFCO provided

that, if they could not mutually agree to the drilling of additional wells under Paragraph No. 2 of the Basic Agreement after the completion of the test wells, the Operating Agreement would govern the drilling of additional wells.

The Operating Agreement was the A.A.P.L. Form 610 Model Form Operating Agreement, 1956 version.[3] In the Operating Agreement, Kadane & Sons and TUFCO stated that they had reached "an agreement to explore and develop these leases and interests for oil and gas [described in Exhibit "A"] to the extent and as hereinafter provided." The subject leases and oil and gas interests are defined in the Operating Agreement as the "Unit Area." The percentage interests of the parties are listed as follows in Exhibit "A" to the Operating Agreement: Kadane & Sons 50 percent and TUFCO 50 percent. Kadane & Sons was the operator of the Unit Area under Paragraph No. 5 of the Operating Agreement.

Paragraph No. 10 of the Operating Agreement is entitled "Term of Agreement" and provides that:

This agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal or otherwise.

Paragraph No. 12 of the Operating Agreement is entitled "Operations By Less Than All Parties" and provides that, if the parties cannot agree upon the drilling or completion of any well or certain other operations on the Unit Area, any party wishing to conduct the operation may give notice of the proposed operation to the other parties. The parties receiving such notice must elect whether or not to participate in the proposed operation. If a party elects not to participate, that party is a "Non–Consenting Party." The party proposing the operation and all other parties electing to participate in the operation are "Consenting Parties." The Consenting Parties bear the entire cost and risk of the proposed operation. The Operating Agreement provides that ownership of the Non–Consenting Parties' interests is transferred to the Consenting Parties:

Upon commencement of operations . . . each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non–Consenting Party's interest in the well, its leasehold operating rights, and share of production therefrom until the proceeds or market value thereof . . . shall equal the total of the following:

(A) 200% of each such Non–Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections . . . plus 100% of each such Non–Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non–Consenting Party's relinquished interest shall revert to it under other provisions of this section . . . and

(B) 300% of that portion of the costs and expenses of drilling, reworking, deepening or plugging back, testing and completing . . . which would have been chargeable to such Non–

---

3. The parties added provisions to the standard Operating Agreement, changed or modified some of the standard provisions, and deleted some of the standard provisions. In order to determine whether the parties impliedly agreed not to partition, we examined the Operating Agreement in its entirety, including the additions, modifications, and deletions.

Consenting Party if it had participated therein. . . .

If and when the Consenting Parties recover from a Non–Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non–Consenting Party shall automatically revert to it and from and after such reversion such Non–Consenting Party shall own the same interest in such well, the operating rights and working interest therein, the material and equipment in or pertaining thereto, and the production therefrom as such Non–Consenting Party would have owned had it participated in the drilling, completing, reworking, deepening or plugging back of said well.

This provision subjects a Non–Consenting Party to a substantial penalty if the proposed operation results in a producing well. Upon commencement of the operation by the Consenting Parties, a Non–Consenting Party forfeits its ownership interest in the well and share in production from the well, and ownership of the Non–Consenting Party's interest transfers to the Consenting Parties. See *Stable Energy v. Kachina Oil & Gas, Inc.*, 52 S.W.3d 327, 332 (Tex.App.-Austin 2001, no pet'n). The interest does not revert back to the Non–Consenting Party until the Consenting Parties have recovered the penalty amounts set forth in Paragraph No. 12.

The Non–Consenting Party provisions in Paragraph No. 12 of the Operating Agreement and the term provision in Paragraph No. 10 of the Operating Agreement, when considered together, imply an agreement not to partition. Under Paragraph No. 12, ownership of a Non–Consenting Party's interest transfers to the Consenting Parties. Thus, the Non–Consenting Party provisions directly affect title to the undivided interests in the leases. Paragraph No. 12 presupposes that a Non–Consenting Party owns an interest that is subject to transfer upon commencement of the operation. If a party to the Operating Agreement were allowed to partition and thereby destroy the joint ownership of the leases, Paragraph No. 12 would be rendered meaningless. Paragraph No. 10 provides that:

> This agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal or otherwise.

Paragraph Nos. 10 and 12 indicate a "desire of the parties to retain the cotenancy status and operational status during the life of the leases." See *Sibley v. Hill,* supra at 229. We find that Kadane & Sons and TUFCO impliedly agreed not to partition the interests in the leases for as long as the leases remain in effect.[4]

Other provisions in the Operating Agreement support the conclusion that Kadane & Sons and TUFCO impliedly agreed not to partition. Under Paragraph Nos. 20, 23, and 24, the parties obtained property rights that are inconsistent with compulsory partition of the undivided interests in the leases. Paragraph No. 20 is

---

**4.** In *MCEN 1996 Partnership v. Glassell,* supra at 264, the parties' designations of two gas units each contained a clause that the unit would remain effective as long "as there is a well within the pooled area capable of producing gas, condensate, distillate, or other liquid hydrocarbon except oil" or as long as "producing, drilling or reworking operations are being conducted." The court held that the clause waived the parties' right to partition "by establishing the conditions under which the unit will cease to exist." While the clause in *MCEN 1996 Partnership* is similar to the term provision in Paragraph No. 10 of the Operating Agreement, we do not base our holding solely upon Paragraph No. 10.

entitled "Maintenance of Unit Ownership" and provides in part:

> For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this contract, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Unit Area and in wells, equipment and production unless such disposition covers either:
>
>> (1) the entire interest of the party in all leases and equipment and production; or
>>
>> (2) an equal undivided interest in all leases and equipment and production in the Unit Area.
>
> Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the rights of the other parties.

Under Paragraph No. 20, the parties may sell or otherwise dispose of their interests, but any such sale or other disposition must be made expressly subject to the Operating Agreement without prejudice to the rights of the other parties. In the event of any such sale or other disposition, the acquiring party and the other parties to the Operating Agreement are joint owners of the undivided interests in the leases, and the leases remain subject to the Operating Agreement. This provision evidences an intent to maintain joint ownership of the interests.

Paragraph No. 23 is entitled "Renewal or Extension of Leases" and provides in part:

> If any party secures a renewal of any oil and gas lease subject to this contract, each and all of the other parties shall be notified promptly, and shall have the right to participate in the ownership of the renewal lease by paying to the party who acquired it their several proper proportionate shares of the acquisition cost, which shall be in proportion to the interests held at that time by the parties in the Unit Area.
>
> If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the unit area to the aggregate of the percentages of participation in the unit area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all the parties elect to participate shall not be subject to this agreement.

The opportunity to participate in the joint ownership of renewal leases is a significant property right. This right further evidences an intent to maintain joint ownership of the leases in the Unit Area.

Paragraph No. 24 is entitled "Surrender of Leases" and provides in part:

> The leases covered by this agreement, in so far as they embrace acreage in the Unit Area, shall not be surrendered in whole or in part unless all parties consent.
>
> However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties not agree or consent, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it. . . . If the assignment is in favor of more than one party, the as-

signed interest shall be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

Any assignment or surrender made under this provision shall not reduce or change the assignors' or surrendering parties' interest, as it was immediately before the assignment, in the balance of the Unit Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

This provision prohibits the surrender of leases in the Unit Area, unless all of the parties consent. The restriction on the ability to surrender leases further supports an implied agreement not to partition the undivided interests in the leases.

Because Kadane & Sons and TUFCO impliedly agreed not to partition their interests in the leases, Dimock and Moran, as successors in interest, are not entitled to partition the parties' interests in the leases. By partition, a contracting party could frustrate or completely avoid responsibilities and rights under a contract to which that party had agreed. The trial court properly granted summary judgment to the Kadane Defendants. We overrule Dimock and Moran's first through fifth points of error.

In their sixth point, Dimock and Moran assert that the trial court erred in awarding attorney's fees to the Kadane Defendants. In declaratory judgment actions, the trial court may award "reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 1997). We review the trial court's award of attorney's fees in a declaratory judgment action under an abuse of discretion standard. *Oake v. Collin County*, 692 S.W.2d 454 (Tex.1985). Dimock and Mor-

an's complaint is that the trial court erred in awarding attorney's fees to the Kadane Defendants because the Kadane Defendants were not entitled to judgment on their counterclaim for declaratory judgment. Dimock and Moran do not complain about the amount of attorney's fees awarded or the testimony supporting the award. We have found that the trial court's granting of summary judgment to the Kadane Defendants on their declaratory judgment action was proper. The Kadane Defendants prevailed on their declaratory judgment action. The trial court did not abuse its discretion in awarding attorney's fees to them. We overrule Dimock and Moran's sixth point of error.

We affirm the judgment of the trial court.