■ In their sixth point, Dimock and Moran assert that the trial court erred in awarding attorney's fees to the Kadane Defendants. In declaratory judgment actions, the trial court may award "reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 1997). We review the trial court's award of attorney's fees in a declaratory judgment action under an abuse of discretion standard. *Oake v. Collin County*, 692 S.W.2d 454 (Tex.1985). Dimock and Moran's complaint is that the trial court erred in awarding attorney's fees to the Kadane Defendants because the Kadane Defendants were not entitled to judgment on their counterclaim for declaratory judgment. Dimock and Moran do not complain about the amount of attorney's fees awarded or the testimony supporting the award. We have found that the trial court's granting of summary judgment to the Kadane

**Joe W. DIMOCK and E.W. Moran Drilling Company, Appellants,**

v.

**Louise KADANE, Michael L. Gustafson, and Carr Staley as Co–Trustees of the Louise Trust; Kadane II, L.L.C.; Mark W. Gray; and Michael L. Gustafson, Appellees.**

No. 11–01–00354–CV.

Court of Appeals of Texas, Eastland.

March 6, 2003.

Rehearing Overruled April 10, 2003.

623

Jess N. Turner III, Turner & Allen, Graham, Joe W. Dimock, Wichita Falls, for appellants.

John M. Key, Russell, Leonard & Key, Wichita Falls, for appellees.

Michael Gustafson, Dallas, pro se.

Mark Gray, Wichita Falls, pro se.

Panel consists of ARNOT, C.J., and WRIGHT, J., and McCALL, J.

### OPINION

W.G. ARNOT, III, Chief Justice.

Joe W. Dimock (Dimock) and E.W. Moran Drilling Company (Moran) brought this partition action against Louise Kadane, Michael L. Gustafson, and Carr Staley as Co–Trustees of the Louise Trust and Kadane II, L.L.C. (the Kadane Defendants); Mark W. Gray; and Michael L. Gustafson.[1] Dimock, Moran, and the Defendants are tenants in common in oil and gas leases. In the trial court, Dimock and Moran sought a partition by sale of the parties' undivided interests in the leases. The Kadane Defendants filed a counterclaim for declaratory judgment. They asserted that the prior owners of the undivided interests in the leases impliedly waived the right to partition under the terms of Letter Agreements and an Operating Agreement and that, therefore, Dimock and Moran were not entitled to partition. The trial court granted summary judgment and rendered judgment in favor of the Kadane Defendants on their declaratory judgment action and awarded them attorney's fees.[2] Because the prior owners of the oil and gas leases impliedly agreed not to partition their interests in the leases, the trial court properly granted summary judgment to the Kadane Defendants. Dimock and Moran appeal from the trial court's judgment denying them partition. We affirm the judgment of the trial court.

This suit involves 53 oil and gas leases that cover acreage in 3 areas in Palo Pinto County, Texas: the Tennyson Area; the Harmon–Constantine Area; and the Bra-

zos River Authority Area. Kadane Oil Company (Kadane) acquired the leases during the years 1974 through 1976. On September 1, 1976, Kadane entered into Letter Agreements with Texas Utilities Fuel Company (TUFCO), Moran, Robert E. Miller, V.I.M. Co., and G.L. Vinson. Under the Letter Agreements, TUFCO, Moran, Miller, V.I.M. Co., and Vinson purchased undivided interests in the leases from Kadane. On September 3, 1976, the parties to the Letter Agreements entered into an Operating Agreement. The parties entered into the Letter Agreements and the Operating Agreement for the purposes of exploring and developing the leases. In 1996, Dimock purchased his interest in the leases from TUFCO and Kadane. Dimock, Moran and the Kadane Defendants agree that the leases are subject to the Letter Agreements and the Operating Agreement.

In their first five points of error, Dimock and Moran assert that the trial court erred in granting summary judgment to the Kadane Defendants. In its judgment, the trial court made a finding that:

> Having examined the particular terms, provisions and conditions of The Agreements, the Court finds that as a matter of law the parties impliedly waived the right to a compulsory partition of The Subject Lands and Plaintiff may not compel a partition of The Subject Lands either in kind or by sale.

■ Joint owners of undivided mineral interests have the statutory right to compel partition under TEX. PROP. CODE ANN. § 23.001 (Vernon 2000). See *MCEN 1996 Partnership v. Glassell*, 42 S.W.3d 262, 263 (Tex.App.-Corpus Christi

---

1. Dimock and Moran also asserted a trespass to try title claim. The trial court entered an agreed order severing the trespass to try title claim from this action.

2. The trial court made Mark W. Gray and Michael L. Gustafson parties to the judgment by separate order.

2001, pet'n den'd). However, joint owners may expressly or impliedly agree not to partition. *MCEN 1996 Partnership v. Glassell*, supra at 263; *Long v. Hitzelberger*, 602 S.W.2d 321, 324 (Tex.Civ.App.-Eastland 1980, no writ); *Lichtenstein v. Lichtenstein Building Corporation*, 442 S.W.2d 765, 769 (Tex.Civ.App.-Corpus Christi 1969, no writ). There is no express agreement not to partition in the Letter Agreements or the Operating Agreement. Therefore, the issue is whether Kadane, TUFCO, Moran, and the other parties to the Letter Agreements and the Operating Agreement impliedly agreed not to partition the mineral interests.

▆▆▆ In order to determine whether the parties impliedly agreed not to partition, the courts "examine the particular contract involved and from the provisions thereof determine whether or not the parties impliedly contracted against partition." See *Warner v. Winn*, 191 S.W.2d 747, 751 (Tex.Civ.App.-San Antonio 1945, writ ref'd n.r.e.). In this context, courts have considered various types of contractual provisions in drilling contracts. For example, if a joint owner of a mineral interest contracts to pay his proportionate part of expenses of drilling and development of the premises for oil and gas, that owner "cannot demand a partition of the mineral estate so as to work a cancellation of the drilling contract, and thereby relieve himself of his proportionate part of the expenses of developing the lease." *Sibley v. Hill*, 331 S.W.2d 227, 229 (Tex.Civ.App.-El Paso 1960, no writ); *Elrod v. Foster*, 37 S.W.2d 339, 342 (Tex.Civ.App.-Austin 1931, writ ref'd). Additionally, "when parties contract for the drilling of wells, and such drilling is either made the consideration for the transfer of a mineral estate or is necessary to extend or perpetuate a lease, it must be inferred that the parties to the drilling agreement did not intend for the estate to be partitioned." *Long v. Hitzelberger*, supra at 323; *Warner v. Winn*, supra at 751. In *Sibley*, the court determined that a provision in an operating agreement giving the parties a preferential right of purchase coupled with a provision that the agreement was to be in force for so long as oil, gas, or other minerals were produced indicated a "clear implication that the absolute right of partition had been contracted away." *Sibley v. Hill*, supra at 229. However, "it can hardly be said that each and every covenant or provision relating to property held in common carries with it the implication that no partition shall be had." *Warner v. Winn*, supra at 751. For example, in *Warner*, the court held that an agreement to manage and operate the properties after the completion of the drilling program, without more, was not sufficient to imply an agreement against partition. *Warner v. Winn*, supra at 751.

▆▆▆ We, therefore, examine the provisions of the Letter Agreements and the Operating Agreement. In the Letter Agreements, Kadane, as the operator, agreed to drill the wells, and the other parties agreed to share the costs and expenses of drilling the wells to casingpoint or plugging and abandoning the wells as dry holes. The Letter Agreements governed operations until the wells reached casingpoint. Kadane agreed to notify the other parties when each of the test wells reached casingpoint. At that time, Kadane would recommend: (1) attempting to complete the well, (2) plugging and abandoning the well as a dry hole, or (3) drilling the well to a depth sufficient to test the Mississippian formation. The other parties would then elect whether to follow Kadane's recommendation. If Kadane recommended attempted completion of the well, the other parties would elect whether or not to consent to the attempted comple-

tion. In Paragraph No. VI of the Letter Agreements, the parties agreed that:

All operations conducted after each Test Well has reached casingpoint or all parties have elected to drill below total depth to test the Mississippian Formation shall be conducted under the terms and provisions of the Operating Agreement dated September 3, 1976, between [Kadane] as Operator, and [TUFCO] et al as Non–Operator, and covering the land and leases in the Tennyson, Harmon–Constantine, and Brazos River Authority Areas.

The Operating Agreement was the A.A.P.L. Form 610 Model Form Operating Agreement, 1956 version.[3] In the Operating Agreement, the parties stated that they had reached "an agreement to explore and develop these leases and interests for oil and gas [described in Exhibit "A"] to the extent and as hereinafter provided." The subject leases and oil and gas interests are defined in the Operating Agreement as the "Unit Area." The percentage interests of the parties are listed as follows in Exhibit "A" to the Operating Agreement: Kadane 25 percent; TUFCO 25 percent; Moran 25 percent; Miller 62 percent of 25 percent; V.I.M. Co. 19 percent of 25 percent; and Vinson 19 percent of 25 percent. Kadane was the operator of the Unit Area under Paragraph No. 5 of the Operating Agreement.

Paragraph No. 10 of the Operating Agreement is entitled "Term of Agreement" and provides that:

This agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as

to any part of the Unit Area, whether by production, extension, renewal or otherwise.

Paragraph No. 12 of the Operating Agreement is entitled "Operations By Less Than All Parties" and provides that, if the parties cannot agree upon the drilling or completion of any well or certain other operations on the Unit Area, any party wishing to conduct the operation may give notice of the proposed operation to the other parties. The parties receiving such notice must elect whether or not to participate in the proposed operation. If a party elects not to participate, that party is a "Non–Consenting Party." The party proposing the operation and all other parties electing to participate in the operation are "Consenting Parties." The Consenting Parties bear the entire cost and risk of the proposed operation. The Operating Agreement provides that ownership of the Non–Consenting Parties' interests is transferred to the Consenting Parties:

Upon commencement of operations ... each Non–Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non–Consenting Party's interest in the well, its leasehold operating rights, and share of production therefrom until the proceeds or market value thereof ... shall equal the total of the following:

(A) 200% of each such Non–Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections ... plus 100% of each such Non–Consenting Party's share of the cost of opera-

3. The parties added provisions to the standard Operating Agreement, changed or modified some of the standard provisions, and deleted some of the standard provisions, in whole or in part. In order to determine

whether the parties impliedly agreed not to partition, we examined the Operating Agreement in its entirety, including the additions, modifications, and deletions.

tion of the well commencing with first production and continuing until each such Non–Consenting Party's relinquished interest shall revert to it under other provisions of this section . . . and

(B) 300% of that portion of the costs and expenses of drilling, reworking, deepening or plugging back, testing and completing . . . which would have been chargeable to such Non–Consenting Party if it had participated therein. . . .

If and when the Consenting Parties recover from a Non–Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non–Consenting Party shall automatically revert to it and from and after such reversion such Non–Consenting Party shall own the same interest in such well, the operating rights and working interest therein, the material and equipment in or pertaining thereto, and the production therefrom as such Non–Consenting Party would have owned had it participated in the drilling, completing, reworking, deepening or plugging back of said well.

This provision subjects a Non–Consenting Party to a substantial penalty if the proposed operation results in a producing well. Upon commencement of the operation by the Consenting Parties, a Non–Consenting Party forfeits its ownership interest in the well and share in production from the well, and ownership of the Non–Consenting Party's interest transfers to the Consenting Parties. See *Stable Energy v. Kachina Oil & Gas, Inc.*, 52 S.W.3d 327, 332 (Tex.App.-Austin 2001, no pet'n). The interest does not revert back to the Non–Consenting Party until the Consenting Parties have recovered the penalty amounts set forth in Paragraph No. 12.

The Non–Consenting Party provisions in Paragraph No. 12 of the Operating Agreement and the term provision in Paragraph No. 10 of the Operating Agreement, when considered together, imply an agreement not to partition. Under Paragraph No. 12, ownership of a Non–Consenting Party's interest transfers to the Consenting Parties. Thus, the Non–Consenting Party provisions directly affect title to the undivided interests in the leases. Paragraph No. 12 presupposes that a Non–Consenting Party owns an interest that is subject to transfer upon commencement of the operation. If a party to the Operating Agreement were allowed to partition and thereby destroy the joint ownership of the leases, Paragraph No. 12 would be rendered meaningless. Paragraph No. 10 provides that "[t]his agreement shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal or otherwise." Paragraph Nos. 10 and 12 indicate a "desire of the parties to retain the cotenancy status and operational status during the life of the leases." See *Sibley v. Hill*, supra at 229. We find that Kadane, TUFCO, Moran, and the other parties to the Operating Agreement impliedly agreed not to partition the interests in the leases for as long as the leases remain in effect.[4]

Other provisions in the Operating Agreement support the conclusion that the parties impliedly agreed not to partition.

---

**4.** *In MCEN 1996 Partnership v. Glassell,* supra at 264, the parties' designations of two gas units each contained a clause that the unit would remain effective as long "as there is a well within the pooled area capable of producing gas, condensate, distillate, or other liquid hydrocarbon except oil" or as long as "producing, drilling or reworking operations are being conducted." The court held that the clause waived the parties' right to partition "by establishing the conditions under which the unit will cease to exist." While the

Under Paragraph Nos. 20, 23, and 24, the parties obtained property rights that are inconsistent with compulsory partition of the undivided interests in the leases. Paragraph No. 20 is entitled "Maintenance of Unit Ownership" and provides in part:

For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this contract, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Unit Area and in wells, equipment and production unless such disposition covers either:

(1) the entire interest of the party in all leases and equipment and production; or

(2) an equal undivided interest in all leases and equipment and production in the Unit Area.

Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the rights of the other parties.

Under Paragraph No. 20, the parties may sell or otherwise dispose of their interests, but any such sale or other disposition must be made expressly subject to the Operating Agreement without prejudice to the rights of the other parties. In the event of any such sale or other disposition, the acquiring party and the other parties to the Operating Agreement are joint owners of the undivided interests in the leases, and the leases remain subject to the Operating Agreement. This provision evidences an intent to maintain joint ownership of the interests.

Paragraph No. 23 is entitled "Renewal or Extension of Leases" and provides in part:

If any party secures a renewal of any oil and gas lease subject to this contract, each and all of the other parties shall be notified promptly, and shall have the right to participate in the ownership of the renewal lease by paying to the party who acquired it their several proper proportionate shares of the acquisition cost, which shall be in proportion to the interests held at that time by the parties in the Unit Area.

If some, but less than all, of the parties elect to participate in the purchase of a renewal lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the unit area to the aggregate of the percentages of participation in the unit area of all parties participating in the purchase of such renewal lease. Any renewal lease in which less than all the parties elect to participate shall not be subject to this agreement.

The opportunity to participate in the joint ownership of renewal leases is a significant property right. This right further evidences an intent to maintain joint ownership of the leases in the Unit Area.

Paragraph No. 24 is entitled "Surrender of Leases" and provides in part:

The leases covered by this agreement, in so far as they embrace acreage in the Unit Area, shall not be surrendered in whole or in part unless all parties consent.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties not agree or consent, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such lease, or portion

---

clause in *MCEN 1996 Partnership* is similar to the term provision in Paragraph No. 10 of the

Operating Agreement, we do not base our holding solely upon Paragraph No. 10.

thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not desiring to surrender it.... If the assignment is in favor of more than one party, the assigned interest shall be shared by the parties assignee in the proportions that the interest of each bears to the interest of all parties assignee.

Any assignment or surrender made under this provision shall not reduce or change the assignors' or surrendering parties' interest, as it was immediately before the assignment, in the balance of the Unit Area; and the acreage assigned or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement.

This provision prohibits the surrender of leases in the Unit Area, unless all of the parties consent. The restriction on the ability to surrender leases further supports an implied agreement not to partition the undivided interests in the leases.

Because the original parties to the Operating Agreement impliedly agreed not to partition their interests in the leases, Dimock and Moran, as successors in interest, are not entitled to partition the parties' interests in the leases. By partition, a contracting party could frustrate or completely avoid responsibilities and rights under a contract to which that party had agreed. The trial court properly granted summary judgment to the Kadane Defendants. We overrule Dimock and Moran's first through fifth points of error.

In their sixth point, Dimock and Moran assert that the trial court erred in awarding attorney's fees to the Kadane Defendants. In declaratory judgment actions, the trial court may award "reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon

1997). We review the trial court's award of attorney's fees in a declaratory judgment action under an abuse of discretion standard. *Oake v. Collin County*, 692 S.W.2d 454 (Tex.1985). Dimock and Moran's complaint is that the trial court erred in awarding attorney's fees to the Kadane Defendants because the Kadane Defendants were not entitled to judgment on their counterclaim for declaratory judgment. Dimock and Moran do not complain about the amount of attorney's fees awarded or the testimony supporting the award. We have found that the trial court's granting of summary judgment to the Kadane Defendants on their declaratory judgment action was proper. The Kadane Defendants prevailed on their declaratory judgment action. The trial court did not abuse its discretion in awarding attorney's fees to them. We overrule Dimock and Moran's sixth point of error.

We affirm the judgment of the trial court.