

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-11-00550-CV

**BP AMERICA PRODUCTION COMPANY**,
Appellant

v.

Carlos M. **ZAFFIRINI** Sr., Dolores Angelina De la Garza, Clarissa De La Garza, Cristina Lorena Benavides, Servando Roberto Benavides, Delia Hilda Benavides Martinez, Maria Eugenia Benavides Gutierrez, Las Tinajas Minerals, Ltd., and Diana Benavides Solis, Appellees

From the 49th Judicial District Court, Webb County, Texas
Trial Court No. 2010CVF000798D1
The Honorable Joe Lopez, Judge Presiding

Opinion by:  Patricia O. Alvarez, Justice

Sitting:  Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  August 30, 2013

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

This is an appeal from the trial court's judgment denying Appellant's motions for summary judgment and granting Appellees' motions for summary judgment in a suit involving the construction of an oil and gas lease. Appellant BP America Production Company executed two separate leases to produce oil and gas from the same mineral estate in Webb County. When a dispute arose over one of the leases, BP filed a declaratory-judgment action and various claims against all the lessors. In turn, the lessors counterclaimed against BP. Later, BP and the lessors

filed competing summary judgment motions. The trial court denied BP's motions, granted the lessors' motions, and BP appealed. We affirm in part and reverse in part the trial court's judgment, render in part, and remand the cause to the trial court for further proceedings consistent with this opinion.

## BACKGROUND

BP executed two separate leases to produce oil and gas from the same mineral estate on approximately 7,520 acres of the Santa Elena Ranch in Webb County. It first executed a lease with Diana Solis (Solis lease) for her 30% interest in the undivided mineral estate. Shortly thereafter, BP intensified its negotiations with the lessors holding the remaining 70% interest; we refer to the combined 70% interest holders as Lessors.[1]

BP and Lessors repeatedly negotiated the bonus provision terms—the central question in this appeal. BP finally executed a second lease (Zaffirini lease) with Lessors, including Solis's family members, who are co-owners of the remaining 70% interest. When a dispute arose over the amount of bonus BP was required to pay under the Zaffirini lease's Favored-Nations[2] clause, BP filed a declaratory-judgment action for the court to determine its obligations under the Zaffirini lease. Lessors, Solis, and BP filed competing summary judgment motions. The trial court denied

---

[1] The trial court judgment and the parties' briefs divide the Zaffirini lease lessors into two groups: the Zaffirini Lessors and the Jones Lessors. The Zaffirini Lessors are Carlos M. Zaffirini Sr., Dolores Angelina de la Garza, Clarissa de la Garza, Cristina Lorena Benavides, Servando Roberto Benavides, and Delia Hilda Benavides Martinez. Zaffirini is an attorney who represented the Solis family members in an earlier dispute and was compensated by acquiring an ownership interest in the mineral interest; he is also one of the attorneys representing the Zaffirini Lessors in this suit. The Jones Lessors are Maria Eugenia Benavides Gutierrez and Las Tinajas Minerals, Ltd. The Jones Lessors are represented by James K. Jones Jr., who is also the general partner in Las Tinajas Minerals, Ltd. For purposes of this opinion, we will use the term Lessors to include all of the Zaffirini lease lessors: the Zaffirini Lessors and the Jones Lessors.

[2] A favored-nations clause in an oil and gas contract is derived from a most-favored-nation clause: "A clause in an agreement between two nations providing that each will treat the other as well as it treats any other nation that is given preferential treatment." *See* BLACK'S LAW DICTIONARY 1035 (8th ed. 2004); *see also Lone Star Gas Co. v. Howard Corp.*, 556 S.W.2d 372, 374 (Tex. Civ. App.—Texarkana 1977), *writ ref'd n.r.e.*, 568 S.W.2d 129 (Tex. 1978) (per curiam) (describing a favored-nations clause).

BP's summary judgment motions, granted Lessors' summary judgment motions, and awarded Lessors (and Diana Solis) a total of approximately $3.9 million in damages and attorney's fees.

## A. Solis Lease

We first address the Solis lease because of its role in this dispute between BP and Lessors. In the Solis lease, BP agreed to pay Solis $1,300 per acre as bonus. The Solis lease also contains a Favored-Nations clause. The clause requires that while Solis's lease is in effect,[3] if BP agrees to more favorable bonus or royalty terms with any other co-owner in the same mineral estate, BP must pay Solis according to the more favorable terms. This requirement to pay Solis additional bonus is the predicate for BP's dispute with Lessors—as described below.

## B. Zaffirini Lease

After BP executed the Solis lease, it continued negotiations with Lessors: Solis's family members, some others, and Carlos M. Zaffirini Sr. BP initially offered Lessors a $1,300 per acre bonus. Lessors countered by asking for a $1,300 per acre bonus and a separate $700 per acre consent-to-assignment fee that the parties would not treat as bonus. BP increased their offer to $1,750 per acre and proposed specific bonus provision language. After more negotiations, Lessors accepted BP's payment offer and the bonus provision language, and the parties executed the Zaffirini lease.

## C. BP's Payment to Solis

Immediately after the parties executed the Zaffirini lease, BP sent Solis a payment for approximately $1,026,000. According to BP, under the Solis lease Favored-Nations clause, BP was obligated to pay Solis an additional $450 per acre bonus because it had granted Lessors a more favorable bonus term than it had negotiated with her. After BP paid Solis, Lessors demanded that

---

[3] The Solis lease's Favored-Nations clause applied to a grant of more favorable bonus prior to October 1, 2011.

BP pay them another $450 per acre as bonus under the Zaffirini lease Favored-Nations clause claiming they had been paid only $1,300 per acre bonus.

## D. BP Sues Lessors

BP rejected Lessors' demand and sued Lessors. BP's original petition sought declaratory relief, costs of suit, and attorney's fees; BP later added fraud and other claims against Lessors. In its fifth amended petition, BP asked the court to declare that, *inter alia*, Lessors were not entitled to any additional bonus, BP was entitled to a lease extension, and BP was entitled to costs and attorney's fees.

BP argued in the alternative—in case the court found that only $1,300 per acre of its payment to Lessors was bonus—that Solis was not entitled to an additional bonus payment, Solis must return the overpayment, and Lessors are not entitled to any additional bonus.

BP pled in the further alternative that the lease was ambiguous and extrinsic evidence should be considered. BP sued Solis to recover the additional $450 per acre it paid her; BP claimed money had and received, unjust enrichment, and unilateral mistake.

## E. Lessors' Counterclaims

Lessors counterclaimed for breach of contract, specifically alleging that BP failed to pay Lessors the additional bonus it owed them under the Zaffirini lease's Favored-Nations clause. They sued BP for damages based on BP's alleged breach of "utmost good faith and fair dealing" standard of conduct that was provided in a lease clause. Lessors also alleged that BP's conduct was fraudulent, malicious, and grossly negligent, and they were entitled to exemplary damages.

## F. Competing Motions for Summary Judgments

After a discovery period, the parties filed competing motions for summary judgment.[4] The Zaffirini Lessors and Jones Lessors filed separate motions that each included traditional and no-evidence motions. In return, BP filed a single traditional motion against Lessors; it filed separate no-evidence motions against the Zaffirini Lessors and the Jones Lessors. We address each of the parties' motions below.

### 1. Zaffirini Lessors' Traditional Motion

The Zaffirini Lessors moved for traditional summary judgment on their counterclaim that BP breached the lease and the Zaffirini Lessors were entitled to damages, additional damages under lease paragraph 36.14, and attorney's fees. The Zaffirini Lessors also moved for summary judgment against BP's claim that the Zaffirini Lessors had a duty to cooperate and BP's claims of fraud, fraudulent inducement, promissory estoppel, fraud by nondisclosure, and negligent misrepresentation. Finally, the Zaffirini Lessors moved for traditional summary judgment against BP's declaratory-judgment claim that it was entitled to a lease extension.

### 2. Zaffirini Lessors' No-Evidence Motion

In their no-evidence motion, the Zaffirini Lessors asserted that BP produced no evidence of the Zaffirini Lessors' breach of contract, breach of duty to cooperate, fraud, fraudulent inducement, fraudulent concealment, fraud by nondisclosure, or negligent misrepresentation. The Zaffirini Lessors also asserted that BP produced no evidence that it was entitled to damages based on promissory estoppel or was entitled to a lease extension.

---

[4] Diana Solis moved for traditional summary judgment on BP's claims against her, and the trial court granted her motion. On appeal, BP does not challenge the portion of the judgment granting Solis's motion.

*3. Jones Lessors' Joinder*

The Jones Lessors joined the Zaffirini Lessors' traditional and no-evidence motions for summary judgment.

*4. BP's Traditional Motion*

In its traditional motion, BP moved for summary judgment against Lessors on its claims for declaratory judgment, breach of contract, breach of the duty to cooperate, fraud, fraudulent inducement, fraud by nondisclosure, promissory estoppel, and negligent misrepresentation, and sought attorney's fees and costs. BP also moved for summary judgment on its challenges to Lessors' claims that BP breached the lease, that BP breached its duty of utmost good faith and fair dealing, and that BP was liable for exemplary damages.

*5. BP's No-Evidence Motion (Jones Lessors)*

BP moved for no-evidence summary judgment against the Jones Lessors. It asserted they provided no evidence on their claims against BP for breach of contract, breach of the duty of good faith and fair dealing, fraud, gross negligence, and liability for additional damages under lease section 36.14.

*6. BP's No-Evidence Motion (Zaffirini Lessors)*

BP also moved for no-evidence summary judgment against the Zaffirini Lessors' claims. It asserted there was no evidence of BP's alleged breach of contract, breach of the duty of good faith and fair dealing, fraud, gross negligence, and liability for additional damages under lease section 36.14. BP's no-evidence motion also asserted that the Zaffirini Lessors presented no evidence on their affirmative defenses of BP's alleged non-reliance on their representations, BP's non-reliance disclaimer condition, BP's alleged failure to use due diligence or its own actions caused its injury, or contractual disclaimer. Finally, BP's no-evidence motion contended that the

Zaffirini Lessors presented no evidence on their affirmative defenses of estoppel, promissory estoppel, quasi-estoppel, waiver, acquiescence, or release.

### 7. *Jones Lessors' Summary Judgment Responses*

The Jones Lessors also sought to join and adopt as their own the Zaffirini Lessors' June 27, 2011 response to BP's traditional and no-evidence motions for summary judgment.

## G. Summary Judgment

After a June 30, 2011 hearing on the motions, the trial court granted the Zaffirini Lessors' and Jones Lessors' traditional and no-evidence motions and granted Solis's traditional motion. It declared that the disputed $450 per acre payment was not bonus and stated that "Solis is entitled under equity and good conscience to retain the $1,026,000 that BP voluntarily paid [her]." It awarded to the lessors the following amounts:

|  | Zaffirini Lessors | Jones Lessors |
|---|---|---|
| Damages | $2,062,179.00 | $294,789.93 |
| Attorneys' Fees | $687,393.00 | $110,546.22 |
| Additional Damages (Lease paragraph 36.14) | $687,393.00 | $73,697.43 |

The trial court awarded Diana Solis $160,000.00 for attorneys' fees through trial, and additional amounts in case of appeal or petition.

The trial court denied BP's traditional and no-evidence motions against the Zaffirini Lessors, the Jones Lessors, and Diana Solis, ordered that BP take nothing on any of its claims against any defendant, and taxed all costs of appeal against BP.

### STANDARDS OF REVIEW

To prevail on a traditional motion for summary judgment, the movant must show "there is no genuine issue as to any material fact and the [movant] is entitled to judgment as a matter of law." TEX. R. CIV. P. 166a(c); *accord Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.

1985). In our review of the trial court's judgment, we examine "the evidence presented in the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *see City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). "We indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Rhône-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *accord Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007) (per curiam). A defendant moving for traditional summary judgment must conclusively disprove at least one essential element of each of the plaintiff's claims. *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999); *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 476–77 (Tex. 1995). "When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence[,] . . . determine all questions presented[,] . . . [and] render the judgment that the trial court should have rendered." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000) (citations omitted); *accord Mann Frankfort*, 289 S.W.3d at 848.

We review a no-evidence summary judgment using a legal sufficiency standard. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003). "We review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006) (citing *City of Keller*, 168 S.W.3d at 827). A trial court may not properly grant a no-evidence motion for summary judgment if the nonmovant's summary judgment evidence contains "more than a scintilla of probative evidence to raise a

genuine issue of material fact." *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *see* TEX. R. CIV. P. 166a(i).

Determining whether a contract is ambiguous and construing an unambiguous contract are questions of law which we review de novo. *See Willis v. Donnelly*, 199 S.W.3d 262, 275 (Tex. 2006); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).

### OPINION ORGANIZATION

The procedural posture of the underlying case is cumbersome.[5] It comprises BP's declaratory judgment action and additional claims, Lessors' counterclaims, and competing motions for traditional and no-evidence summary judgment. To ensure that we address each of the causes of action, affirmative defenses, motions, and responses, we have organized the opinion according to the parties' live pleadings and motions.

First, we address BP's declaratory-judgment action. It is the principal question in this appeal, and its resolution affects almost all of the parties' other claims and affirmative defenses. Second, we address BP's other claims and Lessors' corresponding responses. Third, we address Lessors' claims and BP's responses. Finally, we address BP's attorney disqualification issue.

### DECLARATORY-JUDGMENT ACTION

In its traditional motion, BP moved for summary judgment on its declaratory-judgment claim that the Zaffirini lease was unambiguous and required BP to pay Lessors $1,750 per acre as bonus for Lessors' execution of the lease. The trial court rejected BP's argument and decided the Zaffirini lease contains an implicit allocation of the $1,750 per acre payment into a $1,300 per acre

---

[5] The procedural posture includes, e.g., BP's initial declaratory judgment action, its additional claims against Lessors, the Zaffirini Lessors' counterclaims, the Jones Lessors' counterclaims, the Zaffirini Lessors' traditional and no-evidence motions, the Jones Lessors' traditional and no-evidence motions, BP's traditional motion against Lessors and its separate no-evidence motions against the Zaffirini and Jones Lessors respectively, the Zaffirini Lessors' response to BP's no-evidence motion, the Jones Lessors' motion to adopt the Zaffirini Lessors' no-evidence response, and BP's responses to Lessors' no evidence motions, and the trial court's final judgment.

bonus payment and a $450 per acre consent-to-assignment fee that is not bonus. We must determine whether the trial court erred in its construction of the bonus provisions of the Zaffirini lease.

## A. Lease Provisions

The parties agree the lease is unambiguous, but they dispute the meaning of the lease agreement provisions. The principal lease provisions follow:

> 10.1 . . . . Part of the consideration herein paid by Lessee to Lessor for this lease agreement includes One Thousand Seven Hundred-Fifty ($1,750.00) Dollars per net mineral acre as paid up bonus and as Lessor's consent for Lessee to subsequently assign all or a portion of this leasehold to Lewis Petro Properties, Inc. and to related entities of Lewis Petro Properties, Inc. Furthermore, as to other future assignments to other parties or entities, Lessor shall not unreasonably withhold such consent.
> . . . .
> 10.3 The net mineral acres information upon which Lessor's bonus payment has been calculated has been provided by Lessor and title to same [has] not been confirmed by Lessee. Such net mineral acres have been used solely for the payment of bonus consideration. If Lessee's title examination should later reveal a larger amount of net mineral acres for Lessor, then Lessee shall pay the difference on the basis of the above referenced One Thousand Three Hundred ($1,300.00) Dollars and Four Hundred [sic] ($450.00) Dollars per net mineral acre (for a total of One Thousand Seven Hundred Fifty ($1,750.00) Dollars) to Lessor. However should the title examination reveal less acres, then Lessor shall not be obligated to reimburse Lessee for the difference in net mineral acres.

## B. BP's Argument

BP argues that the trial court erred when it segregated the $450 per acre "as separate consideration" from the bonus payment because (1) the lease's plain language specifies a $1,750 per acre bonus payment with no provision to exclude the $450 per acre from being treated as bonus, and (2) the surrounding circumstances show that BP expressly rejected any allocation between bonus and consent-to-assignment for its upfront payments. BP insists that the only interpretation of the lease that incorporates the well-established meaning of bonus with the express terms of sections 10.1 and 10.3 is that "the $450 per acre referenced in section 10.3 is the bonus amount

paid for the specific assignment right, while the remaining $1,300 per acre represents the bonus consideration paid for all of Lessors' other concessions."

## C. Lessors' Argument

Lessors argue that the trial court properly interpreted the lease by characterizing the $450 per acre payment as a consent-to-assignment fee that is separate and distinct from a bonus payment because (1) the plain language of the lease expressly calls for such a segregation, (2) "[t]he well-established industry term of art 'bonus' does not bar [Lessors'] interpretation of the contract," and (3) surrounding circumstances are inapposite because the lease is unambiguous.

## D. Lease Bonus Provisions

To determine whether the lease is ambiguous and to find its proper construction, we examine the plain language of the lease. We also consider the lease viewed in light of the circumstances surrounding the lease negotiations.

### 1. Plain Language Construction Principles

"If [a] written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker*, 650 S.W.2d at 393; *see Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). "In construing an unambiguous oil and gas lease our task is to ascertain the parties' intentions as expressed in the lease." *Heritage Res., Inc.*, 939 S.W.2d at 121; *accord Anglo-Dutch Petrol. Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011); *see Griffith v. Taylor*, 156 Tex. 1, 5, 291 S.W.2d 673, 675 (1956). We examine the plain language of the entire lease agreement, consider the interaction between each of its provisions, and seek "to harmonize and give effect to all the [lease] provisions." *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005); *accord Heritage Res.*, 939 S.W.2d at 121. If a lease term has a generally accepted meaning in the oil and gas industry, we use its generally accepted meaning.

*See Heritage Res.*, 939 S.W.2d at 121; *Brannon v. Gulf States Energy Corp.*, 562 S.W.2d 219, 222–23 (Tex. 1977); *Griffith*, 156 Tex. at 6, 291 S.W.2d at 676; *see also Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007) (examining a term's meaning in an insurance policy and opining that "[t]erms that are not defined in a [contract] are given their generally accepted or commonly understood meaning").

In Texas oil and gas leases, the generally accepted meaning of bonus[6] is "'the cash consideration paid or agreed to be paid for the execution of the lease.'" *See Griffith*, 156 Tex. at 6, 291 S.W.2d at 676 (quoting *Tex. Co. v. Fontenot*, 8 So. 2d 689, 693 (La. 1942)) (reciting with approval the meaning of bonus given by the Supreme Court of Louisiana); *In re Estate of Slaughter*, 305 S.W.3d 804, 811 (Tex. App.—Texarkana 2010, no pet.) ("'Bonus' is defined as '[a] payment that is made in addition to royalties and rent as an incentive for a lessor to sign an oil-and-gas lease.'" (quoting BLACK'S LAW DICTIONARY 206 (9th ed. 2009))); *see also Schlittler v. Smith*, 128 Tex. 628, 630, 101 S.W.2d 543, 544 (1937) ("The words 'royalty,' 'bonus,' and 'rentals' have a well-understood meaning in the oil and gas business.").

### 2. *Plain Language Analysis*

To determine whether the plain language of the Zaffirini lease is ambiguous and to construe its meaning, we review the lease agreement. *See Anglo-Dutch Petrol.*, 352 S.W.3d at 449–50; *accord Hous. Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011); *Valence Operating Co.*, 164 S.W.3d at 662.

---

[6] The right to receive bonus payments is one of the five interests in a mineral estate. *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986) ("There are five essential attributes of a severed mineral estate: (1) the right to develop (the right of ingress and egress), (2) the right to lease (the executive right), (3) the right to receive bonus payments, (4) the right to receive delay rentals, (5) the right to receive royalty payments."); *accord French v. Chevron U.S.A. Inc.*, 896 S.W.2d 795, 797 (Tex. 1995).

a.  Relevant Lease Sections

In its unnumbered "Definitions" section, the Zaffirini lease defines terms such as "production in paying and/or commercial quantities," "drilling operations," and "shut-in"; it does not define the term "bonus."  Section 10.1 states that "[p]art of *the consideration* herein *paid* by [BP] to [Lessors] *for this lease agreement* includes One Thousand Seven Hundred-Fifty (*$1,750.00*) Dollars per net mineral acre *as paid up bonus* and as [Lessors'] consent for [BP] to subsequently assign all or a portion of this leasehold" to a third party.  (Emphasis added).  Section 10.3 specifies the procedure to apply if the number of actual net mineral acres differs from the Lessors' specified amount.  Under section 10.3, if the number of net mineral acres proves to be more than originally calculated, BP must "pay the difference on the basis of the above referenced One Thousand Three Hundred ($1,300.00) Dollars and Four Hundred [Fifty] ($450.00) Dollars per net mineral acre (for a total of One Thousand Seven Hundred Fifty ($1,750.0) Dollars) to Lessor."

Section 19, which addresses the place of payment, identifies the types of lease payments: "bonus, royalties, shut-in royalties, minimum income payments, [and] force majeure payments." Section 19 also references "other compensation and/or damages which may be due and payable to Lessor," but only does so after enumerating the types of lease payments.  Section 36.12, the "Favored[-]Nations" clause, addresses BP's duties to Lessors regarding an equivalent bonus and royalty fraction, but the section does not separately mention any consent-to-assignment fee or otherwise distinguish any such fee as not being included in bonus.

b.  Construction of the Lease

In this case, the parties refer to the others' negotiators as having many years' experience in negotiating oil and gas leases.  We assume the parties understood the generally accepted meaning of bonus when they negotiated the lease.  *See Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 732

(Tex. 1981); *Zurich Am. Ins. Co. v. Hunt Petrol. (AEC), Inc.*, 157 S.W.3d 462, 465 (Tex. App.—Houston [14th Dist.] 2004, no pet.). The lease does not define the term bonus. Therefore, in deciding the questions of ambiguity and interpretation, we will use the generally accepted meaning of the term bonus. *See Lamar Homes, Inc.*, 242 S.W.3d at 8 ("Terms that are not defined in a policy are given their generally accepted or commonly understood meaning."); *Heritage Res.*, 939 S.W.2d at 121; *Griffith*, 156 Tex. at 6, 291 S.W.2d at 676; *Pratt-Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d 825, 833 (Tex. App.—Dallas 2003, pet. denied) ("Where terms are not defined in agreements, we will use the plain, ordinary and generally accepted meaning attributed to the term or word.").

The plain language of section 10.1 requires BP to pay $1,750 per acre "as paid up bonus and as [Lessors'] consent for [BP] to subsequently assign" their rights in the leasehold. No part of the lease expressly requires a $1,300 per acre bonus and a $450 per acre consent-to-assignment fee. In fact, the *only* place in the lease that subdivides the $1,750 per acre bonus into $1,300 per acre and $450 per acre components is section 10.3. However, section 10.3 does not define bonus, it merely provides the procedure to follow should the initial amount of net mineral acres be in error. Further, no part of the lease expressly excludes the $450 per acre from being considered bonus. We can readily harmonize and give effect to all the lease sections by determining that the $450 per acre is the consideration to execute a lease with a consent-to-assignment provision and the $1,300 per acre was the consideration to execute a lease with the remaining lease provisions. *See Coker*, 650 S.W.2d at 393.

Lessors assert that the plain language of the lease is unambiguous and can be interpreted only to mean that the $450 per acre payment is a separate consent-to-assignment fee that is not considered bonus. Referencing spud fees, seismic fees, and assignment fees, Lessors insist that

the right to contract allows them to negotiate for any fee to which the parties mutually agree, and that such fees are not included in bonus.

We decline to adopt Lessors' interpretation of the lease for at least two reasons. First, we have construed the lease as a matter of law, and the plain language of the lease expressly excludes their interpretation. *See Coker*, 650 S.W.2d at 393. Second, to adopt Lessors' interpretation would require us to reject the generally accepted meaning of bonus: "the cash consideration paid or agreed to be paid for the execution of the lease." *See Griffith*, 156 Tex. at 6, 291 S.W.2d at 676 (quoting *Tex. Co.*, 8 So. 2d at 693) (internal quotation marks omitted); *In re Estate of Slaughter*, 305 S.W.3d at 811 (defining bonus as "[a] payment that is made in addition to royalties and rent as an incentive for a lessor to sign an oil-and-gas lease" (quoting BLACK'S LAW DICTIONARY 206 (9th ed. 2009)) (internal quotation marks omitted)). Such a redefinition would, in this case, defeat the rights of another interest holder; this we cannot do. *See Griffith*, 156 Tex. at 7, 291 S.W.2d at 676–77 (refusing to construe a lease provision in a manner that would change the established oil and gas industry-specific meaning of royalty and thereby "defeat the rights" of another with an interest in the same mineral estate).

Thus, we conclude that the Zaffirini lease is unambiguous and the parties' intent as expressed in the lease is that the bonus is $1,750 per acre. *See Anglo-Dutch Petrol.*, 352 S.W.3d at 451; *Heritage Res.*, 939 S.W.2d at 121. This interpretation is consistent with the commonly understood meaning of bonus, harmonizes the sections, and does not render any section meaningless. *See Valence Operating Co.*, 164 S.W.3d at 662; *Heritage Res.*, 939 S.W.2d at 121; *Griffith*, 156 Tex. at 5, 291 S.W.2d at 675.

In addition to the plain language analysis, we also look to the circumstances surrounding the lease negotiations.

*3. Surrounding Circumstances Principles*

BP argues that we must look to the surrounding circumstances—the lease negotiations—to construe the lease. We agree, and we find further support in the surrounding circumstances for our determination that the lease is unambiguous and calls for an unallocated $1,750 per acre bonus.

"Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Anglo-Dutch Petrol.*, 352 S.W.3d at 449–50 (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008) (per curiam)) (internal quotation marks omitted); *accord Hous. Exploration Co.*, 352 S.W.3d at 469. We construe a contract or lease "to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the parol evidence rule." *Hous. Exploration Co.*, 352 S.W.3d at 469; *accord Madeley*, 626 S.W.2d at 731. We consider surrounding circumstances as a construction aid to determine the parties' intentions as expressed in the plain language of the lease. *See Hous. Exploration Co.*, 352 S.W.3d at 469–72 (allowing courts to consider the parties' act of deleting contract language in discerning the parties' intentions in the contract language).

Surrounding circumstances include contract negotiations, and they "may have some relevance in ascertaining the dominant purpose and intent of the parties embodied in the contract interpreted as a whole." *Id.* at 469–70. "[N]egotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . (c) the meaning of the writing, whether or not integrated." *Id.* at 470 n.28 (second alteration in original) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 214 (1981)) (internal quotation marks omitted). *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. b, illus. 1–4 (1981) (providing examples where negotiations informed the meaning of the contract terms). The parol evidence rule "does

not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Hous. Exploration Co.*, 352 S.W.3d at 469.

### 4. *Negotiations Surrounding the Zaffirini Lease*

We now turn to the circumstances surrounding the Zaffirini lease negotiations. In the initial negotiations, BP offered Lessors $1,300 per acre to execute the lease. Lessors rejected BP's offer and proposed a $2,000 per acre payment. When BP asked to subsequently assign all or part of the leasehold to a third party of its choice, Lessors proposed a $1,300 per acre bonus and a separate $700 per acre consent-to-assignment fee.

BP asserts that Zaffirini wanted to maintain the bonus at $1,300 per acre and create the separate consent-to-assignment fee so that Solis would not benefit from an increased bonus amount in the Zaffirini lease. BP insists that Zaffirini sought this segregation because of an ongoing history of bitter, internecine disputes between Solis and Lessors. BP rejected Lessors' proposal but offered $1,750 per acre as bonus. Carlos Zaffirini, responding for Lessors, stated "I understood the Bonus was $1300 and $450 was for the Lessor's consent to assign. Am I mistaken?" BP reiterated that the bonus would be $1,750 per acre and again rejected the split that Lessors proposed. Nevertheless, Lessors sent BP a draft lease which provided for $1,300 per acre "as paid up bonus" and $450 per acre "as Lessor's consent for Lessee to subsequently assign all or a portion of this leasehold to" a third party of BP's choice. BP again responded that it "wants $1,750 bonus not $1,300 bonus and $450 assign fee."

Undeterred, Lessors sent BP a revised draft which still proposed a $1,300 per acre bonus and a separate $450 per acre consent-to-assignment fee. This time, BP specifically instructed Lessors to revise section 10.1 to read "$1,750 per net mineral acre as paid up bonus and as Lessor's consent for Lessee to subsequently assign." Lessors sent BP yet another draft that retained the $1,300 per acre bonus and separate $450 consent-to-assignment fee. BP again insisted on bonus

of $1,750 per acre with no separate consent-to-assignment fee, and Lessors deleted the following language that they had repeatedly proposed:

> Part of the consideration herein paid by Lessee to Lessor for this lease agreement includes One Thousand Three Hundred ($1,[3]00.00) Dollars per net mineral acre as paid up bonus and Four Hundred [Fifty] ($450.00) Dollars per net mineral acre as Lessor's consent for Lessee to subsequently assign all or a portion of this leasehold to Lewis Petro Properties, Inc. and to related entities of Lewis Petro Properties, Inc.

In its place, Lessors inserted BP's language:

> Part of the consideration herein paid by Lessee to Lessor for this lease agreement includes One Thousand Seven Hundred-Fifty ($1,750.00) Dollars per net mineral acre as paid up bonus and as Lessor's consent for Lessee to subsequently assign all or a portion of this leasehold to Lewis Petro Properties, Inc. and to related entities of Lewis Petro Properties, Inc.

BP sent Lessors a Mineral Ownership Report that applied a bonus of $1,750 per acre, and the parties executed the lease. Immediately thereafter, BP paid Solis an additional $450 per acre under the Solis lease's Favored-Nations clause.

### 5. *Lease Negotiations Support Unallocated Bonus*

In this case, we consider the parties' actions in their lease negotiations for those actions' "relevance in ascertaining the dominant purpose and intent of the parties embodied in the [lease] interpreted as a whole." *See Hous. Exploration*, 352 S.W.3d at 469–70 (quoting *Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777, 781 (Tex. 1977)) (internal quotation marks omitted).

The record shows that throughout the lease negotiations, the parties' respective positions on the bonus and consent-to-assignment questions were consistent and mutually exclusive: Lessors wanted an allocation between a bonus payment and a separate consent-to-assignment fee that the parties would not treat as bonus; BP wanted a single bonus payment as cash consideration to execute the lease with all of its provisions including the consent-to-assignment provision. Lessors repeatedly offered lease drafts that included the split allocation, and BP consistently rejected those

drafts. BP consistently and repeatedly insisted on an all-inclusive bonus and rejected any allocation for a separate consent-to-assignment fee.

The facts and circumstances of the lease negotiations are consistent with the lease terms that specify an unallocated bonus of $1,750 per acre. *See Anglo-Dutch Petrol.*, 352 S.W.3d at 449–50; *accord Hous. Exploration*, 352 S.W.3d at 469. The negotiations inform and confirm the lease terms; they do not vary from or contradict the lease provisions. *See Hous. Exploration*, 352 S.W.3d at 469.

For these reasons, we conclude that the plain language of the lease and the negotiations surrounding the execution of the lease show that the lease is unambiguous and it requires an unallocated $1,750 per acre bonus.

**E. BP's Attorney's Fees**

As part of its declaratory-judgment action, BP also moved for costs and reasonable and necessary attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2008); *Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 161 (Tex. 2004); *see also Edwards Aquifer Auth. v. Chem. Lime, Ltd.*, 291 S.W.3d 392, 405 (Tex. 2009). The trial court denied BP's request for costs and attorney's fees, but it erred in construing the lease.

Applying the proper lease construction, we conclude that BP satisfied its bonus payment obligation to Lessors and BP is the prevailing party on its declaratory-judgment claim. *See EOG Res., Inc. v. Killam Oil Co..*, 239 S.W.3d 293, 304 (Tex. App.—San Antonio 2007, pet. denied).; *State Farm Lloyds v. C.M.W.*, 53 S.W.3d 877, 894 (Tex. App.—Dallas 2001, pet. denied) ("It is appropriate to award attorneys' fees to the prevailing party in a declaratory-judgment action if the trial court believes such fees to be reasonable and necessary and the award of such fees to be equitable and just.").

**F. Declaratory-Judgment Action Disposition**

Having considered the plain language of the entire lease and the lease in light of the surrounding circumstances, we conclude that the lease is unambiguous and expresses the parties' intent that the cash consideration to execute the lease is an unallocated $1,750 per acre, and such cash consideration is bonus as a matter of law. *See Hous. Exploration Co.*, 352 S.W.3d at 469–70; *Heritage Res.*, 939 S.W.2d at 121; *Coker*, 650 S.W.2d at 393. The undisputed summary judgment evidence conclusively proves that BP paid Lessors $1,750 per acre. Thus, BP (1) did not breach the lease agreement by failing to pay Lessors an additional $450 per acre, (2) does not owe Lessors any additional bonus payment, (3) is the prevailing party in the declaratory-judgment action, and (4) is entitled to a reconsideration on remand of its request for attorney's fees under its declaratory-judgment action. The trial court erred in determining otherwise. Accordingly, we sustain BP's first issue; BP's second issue is moot.[7]

BP'S OTHER CLAIMS, LESSORS' RESPONSES

Having determined that the lease required BP to pay $1,750 per acre as bonus, and that the entire amount is bonus, we turn to BP's other claims and Lessors' corresponding responses.

In its fifth amended petition, BP claimed that Lessors breached the lease agreement; breached their implied duty to cooperate; committed common-law fraud, fraudulent inducement, and fraud by nondisclosure; and engaged in negligent misrepresentation. BP moved for traditional summary judgment on its claims; Lessors moved for no-evidence summary judgment on BP's claims. The trial court granted Lessors' motions, and denied BP's motion. On appeal, BP complains that the trial court erred in granting summary judgment for Lessors and against BP on

---

[7] The issue numbers in BP's opening brief "Issues Presented" and "Argument" sections are inconsistent. For purposes of disposing of each of BP's appellate issues, we refer to the issues as they are numbered in the "Issues Presented" section of the opening brief. *See* TEX. R. APP. P. 38.1(f), (i).

its claims against Lessors for fraud, fraudulent inducement, fraud by nondisclosure, and promissory estoppel.[8] We address each of its claims in turn.

## A. Common-Law Fraud

BP claimed Lessors made numerous misrepresentations to it during the lease negotiations and thereby committed common-law fraud. In their no-evidence motions, Lessors challenged each element of common-law fraud and moved for summary judgment. BP asserted that the summary judgment evidence conclusively proved each element of fraud, it was entitled to judgment as a matter of law, and moved for traditional summary judgment. On BP's common-law fraud claim, the trial court granted Lessors' no-evidence motion and denied BP's traditional motion.

### 1. *Applicable Law*

For a common-law fraud claim, a party must prove the following:

(1) that a material representation was made;
(2) that it was false;
(3) that the speaker knew it was false when made or that the speaker made it recklessly without any knowledge of the truth and as a positive assertion;
(4) that he made it with the intention that it be acted upon by the other party;
(5) that the party acted in [justifiable] reliance upon it; and
(6) damage.

*T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992); *accord Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). A plaintiff-movant is not entitled to a traditional summary judgment on a common-law fraud claim if the summary judgment evidence shows there is a genuine issue of material fact as to any essential element of

---

[8] BP does not complain that the trial court erred when it denied BP's claims that Lessors breached the lease agreement, that Lessors breached their duty to cooperate, or that BP was entitled to a *Kothmann* lease extension. *See Kothmann v. Boley*, 158 Tex. 56, 60–61, 308 S.W.2d 1, 4 (1957) (extending the term of an oil and gas lease based on the lessor's misconduct). Similarly, BP does not complain that the trial court granted Lessors' respective traditional and no-evidence motions on their challenges to BP's claims of fraudulent concealment and negligent misrepresentation. Further, BP did not complain that the trial court denied its no-evidence motion against Solis. Because BP did not raise or brief these questions, we will not disturb the specific portions of the trial court's judgment that dispose of these claims. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006) ("Except for fundamental error, appellate courts are not authorized to consider issues not properly raised by the parties.").

the claim. *See* TEX. R. CIV. P. 166a(c); *Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999) (requiring a defendant-movant to conclusively disprove an essential element to be entitled to traditional summary judgment); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). Likewise, a defendant-movant is not entitled to a no-evidence summary judgment if there is more than a scintilla of summary judgment evidence on each essential element of the plaintiff's fraud claim. *See* TEX. R. CIV. P. 166a(i); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003); *In re Guardianship of Patlan*, 350 S.W.3d 189, 198 (Tex. App.—San Antonio 2011, no pet.); *Moritz v. Bueche*, 980 S.W.2d 849, 853, 857 (Tex. App.—San Antonio 1998, no pet.).

### 2. *BP's Traditional Motion*

As movant, BP was not entitled to traditional summary judgment on its common-law fraud claim if the summary judgment evidence, when viewed in the light most favorable to Lessors, showed there was at least one genuine issue of material fact on any of the essential elements of common-law fraud. *See Ernst & Young*, 51 S.W.3d at 577; *T.O. Stanley Boot Co.*, 847 S.W.2d at 222. In its motion, BP asserted that Zaffirini knowingly made false material representations that BP justifiably relied on to BP's detriment. As summary judgment evidence, BP provided deposition excerpts from Pat Taylor—BP's land man and lease negotiator. BP asserted that Zaffirini told Taylor that under the Zaffirini lease terms, BP could pay Solis an additional $450 per acre "without further obligation to any parties." Taylor also testified that BP relied on Zaffirini's representations and that Zaffirini's misrepresentations had denied BP "the benefit of the bargain" for which it had negotiated. BP also provided an affidavit from one of its petroleum engineers that BP had not been able to develop the leasehold because of Lessors' lawsuit, and BP was thus prohibited from realizing a return on its investment. BP insists that it justifiably relied on Zaffirini's false representations, entered into the contract, Lessors sued, and BP suffered damage.

In their traditional motions for summary judgment, Lessors challenged BP's claim that BP justifiably relied on Lessors' representations. Lessors' summary judgment evidence included deposition excerpts from Taylor's testimony in which—according to Lessors—Taylor admits that BP relied on its own lawyers and did not rely on Lessors' statements. Lessors contend that Taylor's deposition testimony, BP's nonreliance disclaimer condition, and the amendment clause in the Zaffirini lease all show that BP either could not or did not justifiably rely on Zaffirini's representations.

Viewing the evidence in the light most favorable to Lessors, we conclude that there are genuine issues of material fact as to the element of justifiable reliance in BP's common-law fraud claim. *See* TEX. R. CIV. P. 166a(c); *Elliott-Williams Co.*, 9 S.W.3d at 803; *Nixon*, 690 S.W.2d at 548. Therefore, BP is not entitled to traditional summary judgment on its common-law fraud claim. *See Ernst & Young*, 51 S.W.3d at 577; *T.O. Stanley Boot Co.*, 847 S.W.2d at 222.

*3. Lessors' No-Evidence Motions*

As no-evidence movants, Lessors' motions had to specify the essential elements of BP's common-law fraud claim for which there is no evidence. *See* TEX. R. CIV. P. 166a(i); *Callaghan Ranch, Ltd. v. Killam*, 53 S.W.3d 1, 3 (Tex. App.—San Antonio 2000, pet. denied). Lessors are not entitled to no-evidence summary judgment on BP's common-law fraud claim if there is more than a scintilla of summary judgment evidence on the challenged elements of BP's claim. *See* TEX. R. CIV. P. 166a(i); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *Moritz*, 980 S.W.2d at 853, 857. In their no-evidence motions, Lessors challenged BP's evidence only on the elements of reliance and damage.

In its response, BP provided Pat Taylor's affidavit in which Taylor testified that BP relied on Zaffirini's representations and that Zaffirini's misrepresentations had denied BP "the benefit of the bargain" for which it had negotiated. BP also provided an affidavit from one of its petroleum

engineers that BP had not been able to develop the leasehold because of Lessors' lawsuit, and BP was thus prohibited from realizing a return on its investment.

Viewing the evidence in the light most favorable to BP, we conclude that BP produced more than a scintilla of evidence on the challenged elements of justifiable reliance and damage, and Lessors are not entitled to no-evidence summary judgment on BP's common-law fraud claim. *See Ridgway*, 135 S.W.3d at 600; *Moritz*, 980 S.W.2d at 853.

### 4. *Lessors' Traditional Motions*

In their traditional motions for summary judgment against BP's common-law fraud claim, Lessors challenged the reliance and damage elements. To prevail on their traditional motions, Lessors had to present summary-judgment proof that there are no genuine issues of material fact on either element and Lessors are entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Nixon*, 690 S.W.2d at 548. Lessors could do so by conclusively disproving either reliance or damage—each an essential element of BP's fraud claim. *See Elliott-Williams Co.*, 9 S.W.3d at 803; *Dove v. Graham*, 358 S.W.3d 681, 684 (Tex. App.—San Antonio 2011, pet. denied). However, as previously noted, BP's summary judgment evidence included deposition testimony that BP relied on Lessors' representations and had been damaged thereby. We conclude that BP's summary judgment evidence raises genuine issues of material fact on the elements of reliance and damage. Therefore, Lessors did not conclusively disprove an essential element of BP's fraud claim and are not entitled to traditional summary judgment. *See* TEX. R. CIV. P. 166a(c); *Elliott-Williams Co.*, 9 S.W.3d at 803; *Nixon*, 690 S.W.2d at 548.

## B. Fraudulent Inducement

### 1. *Applicable Law*

Fraudulent inducement is a species of fraud; it comprises each element of common-law fraud, and each element must "relate to an agreement between the parties." *Haase v. Glazner*, 62

S.W.3d 795, 798–99 (Tex. 2001); *accord Holloway v. Dekkers*, 380 S.W.3d 315, 325 (Tex. App.— Dallas 2012, no pet.). Fraudulent inducement also requires an additional element: "the existence of a contract." *Haase*, 62 S.W.3d at 798–99; *accord Holloway*, 380 S.W.3d at 325.

### 2. BP's Traditional Motion

BP moved for traditional summary judgment on its fraudulent-inducement claim against Lessors. However, Lessors again cited Pat Taylor's deposition testimony, BP's nonreliance disclaimer condition, and the amendment clause in the Zaffirini lease to show that BP could not justifiably rely on Zaffirini's representations. Lessors' summary judgment evidence raised a genuine issue of material fact on the essential element of reliance. Because justifiable reliance is an essential element of fraud in the inducement, and Lessors raised a genuine issue of material fact on that element, BP is not entitled to traditional summary judgment on its fraud-in-the-inducement claim. *See* TEX. R. CIV. P. 166a(c); *Elliott-Williams Co.*, 9 S.W.3d at 803; *Nixon*, 690 S.W.2d at 548.

### 3. Lessors' No-Evidence Motions

Lessors' no-evidence motions challenged only the reliance and damage elements of BP's fraud claims, including its fraud in the inducement claim. BP responded with Pat Taylor's deposition testimony that BP relied on Zaffirini's representations and its engineer's deposition testimony that BP had not been able to develop the leasehold and had suffered damage. As we have previously concluded, BP produced more than a scintilla of evidence on the challenged fraud elements of reliance and damage. Further, BP's evidence of alleged fraud in the inducement is "related to an agreement between the parties" and the evidence conclusively proves the existence of a contract. *See Haase*, 62 S.W.3d at 798–99; *Holloway*, 380 S.W.3d at 325. Therefore, Lessors are not entitled to summary judgment on their no-evidence motion against BP's fraud in the

inducement claim. *See* TEX. R. CIV. P. 166a(i); *Ridgway*, 135 S.W.3d at 600; *Moritz*, 980 S.W.2d at 853.

### 4. *Lessors' Traditional Motions*

Lessors' traditional motions challenged the reliance and damage elements of BP's fraud in the inducement claim. However, as we have noted above, BP's affidavits raise genuine issues of material fact on the elements of reliance and damage. Therefore, Lessors did not conclusively disprove an essential element of BP's fraud in the inducement claim and are not entitled to traditional summary judgment. *See* TEX. R. CIV. P. 166a(c); *Elliott-Williams Co.*, 9 S.W.3d at 803; *Nixon*, 690 S.W.2d at 548.

## C. Fraud by Nondisclosure

### 1. *Applicable Law*

Fraud by nondisclosure is another species of fraud. *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). Like common-law fraud, fraud by nondisclosure includes the elements of justifiable reliance and damage. *See Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 850 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *see also Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex. 2001).

### 2. *BP's Traditional Motion*

BP moved for summary judgment on its claim against Lessors for fraud by nondisclosure. However, Lessors cited Pat Taylor's deposition testimony, BP's nonreliance disclaimer condition, and the amendment clause in the Zaffirini lease to show that BP could not justifiably rely on Zaffirini's representations. Lessors' summary judgment evidence raised a genuine issue of material fact on the essential element of reliance. Because justifiable reliance is also an essential element of fraud by nondisclosure, and Lessors raised a genuine issue of material fact on that

element, BP is not entitled to traditional summary judgment on its fraud by nondisclosure claim. *See* TEX. R. CIV. P. 166a(c); *Nixon*, 690 S.W.2d at 548.

### 3. *Lessors' No-Evidence Motions*

Lessors' no-evidence motions challenged only the reliance and damage elements of BP's fraud claims, including its fraud by nondisclosure claim. BP responded with Pat Taylor's deposition testimony that BP relied on Zaffirini's representations and its engineer's deposition testimony that BP had not been able to develop the leasehold and had suffered damage. Thus, BP produced more than a scintilla of evidence on the challenged fraud elements of reliance and damage. Therefore, Lessors are not entitled to summary judgment on their no-evidence motion against BP's fraud by nondisclosure inducement claim. *See* TEX. R. CIV. P. 166a(i); *Ridgway*, 135 S.W.3d at 600; *Moritz*, 980 S.W.2d at 853.

### 4. *Lessors' Traditional Motions*

Lessors' traditional motions challenged the reliance and damage elements of BP's fraud by nondisclosure claim. Again, as we have noted above, BP's affidavits raise genuine issues of material fact on the elements of reliance and damage. Lessors did not conclusively disprove an essential element of BP's fraud by nondisclosure claim and are not entitled to traditional summary judgment. *See* TEX. R. CIV. P. 166a(c); *Elliott-Williams Co.*, 9 S.W.3d at 803; *Nixon*, 690 S.W.2d at 548.

## D. Promissory Estoppel

BP contends that during lease negotiations on December 18, 2009, Zaffirini promised BP that Lessors would agree to a $1,750 per acre bonus with no allocation between bonus and consent-to-assignment fee. According to BP, after Zaffirini promised to accept BP's bonus terms, the parties incorporated BP's proposed language into the lease, and the parties executed the lease. BP asserts that it "entered into the contract based on Zaffirini's promise to abandon his allocation

provision that called for a $1,300 [per acre] bonus with a $450 [per acre] 'assignment fee' and rather accept a $1,750 [per acre] bonus as BP had proposed all along." BP raised a promissory-estoppel claim against Lessors, and moved for traditional summary judgment on its claim.

### 1. Applicable Law

"The requisites of promissory estoppel are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983); *accord Richter v. Wagner Oil Co.*, 90 S.W.3d 890, 899 (Tex. App.—San Antonio 2002, no pet.). However, "[p]romissory estoppel is not applicable to a promise covered by a valid contract between the parties." *Richter*, 90 S.W.3d at 899; *accord Doctors Hosp. 1997, L.P. v. Sambuca Hous., L.P.*, 154 S.W.3d 634, 636 (Tex. App.—Houston [14th Dist.] 2004, pet. abated). "If an alleged promise is part of a valid contract, the promisee cannot disregard the contract and sue for reliance damages under the doctrine of promissory estoppel." *Stable Energy, L.P. v. Kachina Oil & Gas, Inc.*, 52 S.W.3d 327, 336 (Tex. App.—Austin 2001, no pet.); *accord Doctors Hosp. 1997*, 154 S.W.3d at 636.

### 2. BP's Promissory-Estoppel Claim Fails

BP sought damages from Lessors based on its promissory-estoppel claim. By its claim, BP seeks to enforce Zaffirini's promise that the bonus provision language in the lease agreement would mean an unallocated $1,750 per acre bonus. However, the lease agreement is a valid contract, and the promise BP seeks to enforce is part of that contract. *See Richter*, 90 S.W.3d at 899; *Stable Energy*, 52 S.W.3d at 336. Therefore, BP may not seek damages from Lessors on its bonus provision promissory-estoppel claim. *See Richter*, 90 S.W.3d at 899; *Stable Energy, L.P.*, 52 S.W.3d at 336.

### 3. *Promissory-Estoppel Claim Properly Denied*

The trial court did not err in denying BP's traditional motion for summary judgment on its promissory-estoppel claim. Likewise, the trial court properly granted Lessors' no-evidence motions on BP's promissory-estoppel claim. Lessors' promissory-estoppel defenses in their traditional motions are moot.

### E. BP's No-Evidence Motion Against the Zaffirini Lessors

The same day the Zaffirini Lessors filed their traditional and no-evidence motions against BP, they also filed a first amended original answer. In their amended answer, Zaffirini Lessors pled numerous affirmative defenses. In its no-evidence motion, BP contended that the Zaffirini Lessors presented no evidence on their affirmative defenses to BP's claims.

### 1. *Applicable Law*

To defeat a no-evidence summary-judgment motion, the nonmovant must provide summary-judgment proof that raises a genuine issue of material fact on each challenged element. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *Moritz v. Bueche*, 980 S.W.2d 849, 853 (Tex. App.—San Antonio 1998, no pet.). Conclusory statements are insufficient to raise a genuine issue of material fact on a challenged element and will not defeat a no-evidence summary motion. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 803 (Tex. 2004); *Gonzales v. Shing Wai Brass & Metal Wares Factory, Ltd.*, 190 S.W.3d 742, 746 (Tex. App.—San Antonio 2005, no pet.) ("A conclusory statement is one that does not provide the underlying facts to support the conclusion, and is insufficient to create a question of fact to defeat summary judgment."). The nonmovant's response must "specifically identify the supporting [summary judgment evidence] that it seeks to have considered by the trial court." *Shing Wai Brass*, 190 S.W.3d at 746; *accord Arredondo v. Rodriguez*, 198 S.W.3d 236, 238 (Tex. App.—San Antonio 2006, no pet.). "Attaching entire documents . . . to a response and referencing them only

generally does not relieve the party of pointing out to the trial court where in the documents the issues set forth in the . . . response are raised." *Shing Wai Brass*, 190 S.W.3d at 746; *accord Arredondo*, 198 S.W.3d at 238–39.

### 2. *Zaffirini Lessors' Fraud Defenses*

BP asserted various fraud claims against Lessors based on Lessors' alleged misrepresentations to BP. In response, Lessors raised affirmative defenses that each of BP's fraud claims fails because BP did not justifiably rely on Lessors' representations. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (fraud requires justifiable reliance); *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). In its no-evidence motion, BP challenged the no-reliance element of the Zaffirini Lessors' affirmative defenses; it asserted that the Zaffirini Lessors presented no evidence that BP did not rely on Lessors' representations. *See* TEX. R. CIV. P. 166a(i); *Callaghan Ranch, Ltd. v. Killam*, 53 S.W.3d 1, 3 (Tex. App.—San Antonio 2000, pet. denied). In their response, the Zaffirini Lessors asserted that BP was not entitled to summary judgment because, according to the Zaffirini Lessors, Pat Taylor admitted in his deposition that BP did not rely on Zaffirini's representations. The Zaffirini Lessors included Taylor's deposition as an appendix to their response. Viewing the evidence in the light most favorable to the Zaffirini Lessors, their response raised a genuine issue of material fact on the reliance element that BP challenged. *See Ridgway*, 135 S.W.3d at 600; *Moritz*, 980 S.W.2d at 853. Therefore, BP was not entitled to summary judgment on its no-evidence motion challenging the Zaffirini Lessors' nonreliance affirmative defenses to BP's claims of fraud, fraudulent inducement, and fraud by nondisclosure. *See* TEX. R. CIV. P. 166a(i); *Ridgway*, 135 S.W.3d at 600.

### 3. Miscellaneous Defenses

In their first amended original answer, the Zaffirini Lessors pled the "affirmative defenses" of estoppel, quasi-estoppel, promissory estoppel, BP's lack of diligence, comparative negligence, contractual disclaimer, waiver, acquiescence, and release. In its no-evidence motion, BP challenged at least one element of each of these defenses. *See* TEX. R. CIV. P. 166a(i) (movant must state challenged element); *Killam*, 53 S.W.3d at 3 (same).

The Zaffirini Lessors' ninety-nine page response was supplemented by a 929 page appendix consisting of thirty-nine exhibits, for a total of 1,028 pages. In each paragraph that responded to the challenged affirmative defense, the Zaffirini Lessors identified the elements that BP had challenged, and then provided a list of exhibits under the heading "Responsive Evidence." *See Shing Wai Brass*, 190 S.W.3d at 746 (general references are inadequate). The exhibits were attached in their entirety, and none of the response's paragraphs specifically identified the portion or portions of the generally referenced exhibits that provided supporting evidence. *See Arredondo*, 198 S.W.3d at 238–39 (requiring a respondent to "point[] out to the trial court where in the documents the issues set forth in the motion or response are raised"). Further, none of the response's paragraphs provided any explanation of how the evidence within any listed exhibit raised a genuine issue of material fact. *See Arredondo*, 198 S.W.3d at 238–39; *Shing Wai Brass*, 190 S.W.3d at 746.

This court has no obligation to wade through the Zaffirini Lessors' voluminous response in search of respondent's proof. *See Arredondo*, 198 S.W.3d at 238–39; *Shing Wai Brass*, 190 S.W.3d at 746. The Zaffirini Lessors failed to specifically identify the summary judgment evidence that raised a genuine issue of material fact on their affirmative defenses of estoppel, quasi-estoppel, promissory estoppel, BP's lack of diligence, comparative negligence, contractual disclaimer, waiver, acquiescence, and release. Therefore, BP was entitled to summary judgment

on these Zaffirini Lessors' defenses, and the trial court erred by denying these portions of BP's no-evidence motion against the Zaffirini Lessors' motion. *See Arredondo*, 198 S.W.3d at 238–39; *Shing Wai Brass*, 190 S.W.3d at 746.[9]

**LESSORS' CLAIMS, BP'S RESPONSES**

Having addressed BP's claims and Lessors' corresponding responses, we turn to Lessors' claims and BP's corresponding responses. In their separate but essentially identical traditional motions for summary judgment, the Zaffirini Lessors and Jones Lessors moved for judgment on their claims that BP breached the Zaffirini lease agreement's Favored-Nations clause (section 36.12) by not paying them the mandatory additional bonus or providing them the required additional information. In reply, BP moved for traditional and no-evidence summary judgment on its challenges to Lessors' claims. We first address BP's no-evidence motion challenging Lessors' claims. *See Ford Motor Co.*, 135 S.W.3d at 600 (analyzing a no-evidence motion before a traditional motion because the disposition of the no-evidence motion could moot the traditional motion); *Blackard v. Fairview Farms Land Co.*, 346 S.W.3d 861, 867 (Tex. App.—Dallas 2011, no pet.) (same).

**A.  No-Evidence Summary Judgment Response Requirements**

If a party moves for a no-evidence summary judgment, the nonmovant must file a response sufficient to raise a genuine issue of material fact. *See* TEX. R. CIV. P. 166a(i); *Ridgway*, 135 S.W.3d at 600. To have its response considered, the nonmovant must file the response "not later than seven days prior to the day of hearing," and may not file a response after the deadline "[e]xcept on leave of court." TEX. R. CIV. P. 166a(c); *accord Benchmark Bank v. Crowder*, 919 S.W.2d 657,

---

[9] The Zaffirini Lessors failed to meet their no-evidence burden on BP's promissory-estoppel claim. However, as previously discussed, BP's promissory-estoppel claim fails as a matter of law. The Zaffirini Lessors' affirmative defense of promissory estoppel is therefore moot.

663 (Tex. 1996) (traditional motion). If a response is filed late, we presume the trial court did not consider it unless there is an affirmative indication in the record that the trial court granted leave to file the response. *See Crowder*, 919 S.W.2d at 663; *Neimes v. Ta*, 985 S.W.2d 132, 138 (Tex. App.—San Antonio 1998, pet. dism'd by agr.) (traditional motion). If the nonmovant fails to timely file a response, the record does not affirmatively show the trial court granted leave to file, and the motion meets the requirements of Rule 166a(i), the trial court must grant the no-evidence motion. *See Landers v. State Farm Lloyds*, 257 S.W.3d 740, 746 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Roventini v. Ocular Sciences, Inc.*, 111 S.W.3d 719, 724 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *cf. Crowder*, 919 S.W.2d at 663 ("Summary judgment evidence may be filed late, but only with leave of court."); *Neimes*, 985 S.W.2d at 138. Likewise, if "the evidence establishes conclusively the opposite of the vital fact," the trial court must grant the no-evidence motion. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error,* 38 TEX. L. REV. 361, 362–63 (1960)) (internal quotation marks omitted); *Castillo v. Gulf Coast Livestock Mkt., L.L.C.*, 392 S.W.3d 299, 302–03 (Tex. App.—San Antonio 2012, no pet.).

## B.  Zaffirini Lessors' Contract, Tort Claims Against BP

In their traditional motion and first amended counterclaim, the Zaffirini Lessors claimed BP breached the lease, acted fraudulently, committed gross negligence, and owes them additional damages under lease section 36.14. BP filed a no-evidence motion against the Zaffirini Lessors' claims that specifically challenged at least one essential element in each of the Zaffirini Lessors' claims. The Zaffirini Lessors timely filed a response to BP's no-evidence motion, and the trial court denied BP's no-evidence motion against the Zaffirini Lessors' claims. We address each of the Zaffirini Lessors' claims and BP's corresponding responses.

   *1. Zaffirini Lessors' Breach of Contract Claims*

   In their traditional motion and first amended counterclaim, the Zaffirini Lessors claim BP breached section 36.12 of the lease agreement—the Favored-Nations clause—for two reasons: (1) BP did not pay them the additional $450 per acre bonus; and (2) BP breached its contractual obligation of good faith and fair dealing by not providing them the required Solis lease information. In its no-evidence motion against the Zaffirini Lessors' breach of contract and breach of good faith and fair dealing claims, BP challenged the elements of breach and damage. It asserted that there was no evidence that BP breached the lease, no evidence that it failed to provide information under section 36.12, and no evidence that the Zaffirini Lessors sustained any damage as the result of BP's alleged breach of contract. *See Killeen*, 248 S.W.3d at 349 (breach of contract elements); *Southwell*, 974 S.W.2d at 354 (same). The trial court granted the Zaffirini Lessors' traditional motion for summary judgment on their claim that BP breached the lease agreement; it denied BP's no-evidence motion.

   a. Bonus Payment

   The Zaffirini Lessors claimed that BP breached section 36.12 of the Zaffirini lease by not paying them an additional $450 per acre after BP paid Solis an additional $450 per acre. The Zaffirini Lessors admit that BP paid them $1,750 per acre, but argue that only $1,300 per acre was bonus and the remaining $450 per acre was a separate consent-to-assignment fee not included in bonus. However, we have rejected the Zaffirini Lessors' interpretation of the Zaffirini lease. The correct interpretation required BP to pay the Zaffirini Lessors $1,750 per acre as bonus. *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Under the proper interpretation of the lease, the evidence establishes conclusively that BP did not breach the lease agreement by refusing to pay Lessors an additional $450 per acre. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (recognizing the

- 34 -

court must grant a no-evidence motion if "the evidence establishes conclusively the opposite of the vital fact") (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error,* 38 TEX. L. REV. 361, 362–63 (1960)) (internal quotation marks omitted)); *Ridgway*, 135 S.W.3d at 600. BP was entitled to no-evidence summary judgment against the Zaffirini Lessors' claim that BP breached the contract by failing to pay them an additional $450 per acre. *See Ridgway*, 135 S.W.3d at 600.

### b. Solis Lease Information

The Zaffirini Lessors also claimed BP breached its contractual obligation of good faith and fair dealing by failing to provide them with full and complete information regarding the Solis lease. The Zaffirini lease's Favored-Nations clause has two provisions that are relevant here: a trigger and an obligation; in this case, the trigger provision is dispositive. The obligation to provide Lessors with a copy of the more favorable lease and "grant [Lessors] an equivalent increase" is triggered only if BP or its successors "extend or grant more favorable bonus . . . to any other owner or owners of any mineral interest in the leased premises." The Zaffirini Lessors assert that BP paid them only $1,300 per acre bonus; they segregate the remaining $450 per acre as a consent-to-assignment fee separate from bonus. Following the Zaffirini Lessors' logic, when BP paid Solis an additional $450 per acre bonus (after BP executed the Zaffirini lease), BP granted Solis a more favorable bonus, and thus triggered the "equivalent increase" and lease copy requirements of section 36.12. But under the correct interpretation of the Zaffirini lease, BP's $1,750 per acre payment to the Zaffirini Lessors was all bonus. *See Coker*, 650 S.W.2d at 393 (reiterating that courts construe an unambiguous contract as a matter of law); *see also Heritage Res.*, 939 S.W.2d at 121.

As a matter of law, BP's payment of an additional $450 per acre to Solis under the Solis lease's Favored-Nations clause to match the $1,750 per acre bonus BP had already paid to Lessors

did not "extend or grant more favorable bonus" to Solis and did not trigger any obligation under section 36.12. Accordingly, the Zaffirini Lessors' response provided no evidence that BP breached any obligation of good faith and fair dealing to provide information under the Zaffirini lease's Favored-Nations clause. *See City of Keller*, 168 S.W.3d at 810; *Castillo*, 392 S.W.3d at 302–03. BP was entitled to summary judgment on its no-evidence challenge to the Zaffirini Lessors' breach of contract claim.

### c. Section 36.14 Damages

The Zaffirini Lessors claimed that BP breached the contract and thus owed them additional damages under lease section 36.14. By its plain language, section 36.14 requires BP to pay damages to the Zaffirini Lessors *if* Lessors "obtain a non-appealable judgment" against BP for money damages. However, the trial court's judgment expressly states that the judgment is appealable, and thus conclusively disproves section 36.14's prerequisite for a "non-appealable judgment." *See City of Keller*, 168 S.W.3d at 810; *Castillo*, 392 S.W.3d at 302–03. BP was entitled to judgment on its no-evidence motion against the Zaffirini Lessors' claim for additional damages under section 36.14.

### d. Attorney's Fees

The Zaffirini Lessors sought attorney's fees based on BP's breach of contract. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (West 2008). The trial court granted the Zaffirini Lessors' traditional motion on breach of contract and awarded the Zaffirini Lessors attorney's fees. As we have already determined, BP did not breach the contract; therefore, the Zaffirini Lessors were not entitled to attorney's fees for breach of contract and BP was entitled to summary judgment on its corresponding no-evidence motion. *See id.*; *Green Int'l*, 951 S.W.2d at 390 ("To recover attorney's fees under Section 38.001, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages.").

e. BP Did Not Breach Zaffirini Lease

Under the proper construction of the unambiguous contract, the evidence establishes conclusively that BP did not breach section 36.12 of the lease agreement under any basis claimed by the Zaffirini Lessors. *See City of Keller*, 168 S.W.3d at 810; *Coker*, 650 S.W.2d at 393 (construing contracts). Therefore, the trial court erred when it (1) granted the Zaffirini Lessors' and Jones Lessors' traditional motions for summary judgment against BP on their claims that BP breached the Zaffirini lease; (2) awarded the Zaffirini Lessors and the Jones Lessors damages for breach of contract; (3) awarded the Zaffirini Lessors and Jones Lessors attorney's fees, costs, and additional damages under lease section 36.14; and (4) denied BP's no-evidence motion against Lessors' claims that BP breached the lease agreement. Because BP was entitled to summary judgment on its no-evidence motion against all of the Zaffirini Lessors' and Jones Lessors' breach of contract claims, we need not consider the corresponding challenges BP raised in its traditional motion. *See Ridgway*, 135 S.W.3d at 600.

2. *Zaffirini Lessors' Fraud, Gross Negligence Claims*

In their first amended counterclaim, the Zaffirini Lessors contended that BP's conduct was "fraudulent, malicious and grossly negligent, and justifies an award of exemplary damages." In its no-evidence motion contesting the Zaffirini Lessors' fraud claim, BP challenged the elements of a false, material representation; reliance; and resulting injury. *See In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001) (fraud elements); *Landers*, 257 S.W.3d at 746; *Roventini*, 111 S.W.3d at 724. On the Zaffirini Lessors' gross negligence claim, BP challenged the elements of extreme risk, BP's actual, subjective awareness of the risk, and its acting with conscious indifference to the rights of others. *See Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001) (gross negligence elements); *Landers*, 257 S.W.3d at 746; *Roventini*, 111 S.W.3d at 724.

### a. Summary Judgment Response

In their summary-judgment response, the Zaffirini Lessors identified seven elements of fraud. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992) (identifying the elements of fraud). For each element of fraud, the Zaffirini Lessors provided a list of exhibits under the heading "Responsive Evidence." *Contra Gonzales v. Shing Wai Brass & Metal Wares Factory, Ltd.*, 190 S.W.3d 742, 746 (Tex. App.—San Antonio 2005, no pet.) (rejecting—as failing to meet the nonmovant's burden—the practice of "[a]ttaching entire documents to a . . . summary judgment . . . response and referencing them only generally"); *see Arredondo v. Rodriguez*, 198 S.W.3d 236, 238 (Tex. App.—San Antonio 2006, no pet.) (same). The exhibits were attached in their entirety, and none of the response's seven subparagraphs specifically identified the portion or portions of the generally referenced exhibits that provided supporting evidence. *See Arredondo*, 198 S.W.3d at 238–39 (requiring a respondent to "point[] out to the trial court where in the documents the issues set forth in the motion or response are raised"). Further, only one of the seven subparagraphs on the elements of fraud provided any explanation of how the evidence within any listed exhibit raised a genuine issue of material fact; the one response subparagraph on gross negligence also failed to provide any explanation. *See Arredondo*, 198 S.W.3d at 238–39; *Shing Wai Brass*, 190 S.W.3d at 746.

### b. Response Failed to Meet Burden

The Zaffirini Lessors' response to BP's no-evidence motion failed to meet their burden to specifically identify the summary judgment evidence that supported their claims of fraud and gross negligence. *See Arredondo*, 198 S.W.3d at 238–39 ("Because [nonmonvants'] response did not direct the trial court to any specific portion of their summary judgment evidence, [nonmovants] failed to raise a fact issue sufficient to defeat [movant's] no-evidence motion for summary judgment."); *Shing Wai Brass*, 190 S.W.3d at 746. Therefore, BP was entitled to summary

judgment on its no-evidence challenges to the Zaffirini Lessors' fraud and gross negligence claims, and the trial court erred by denying these portions of BP's no-evidence motion. *See Arredondo*, 198 S.W.3d at 238–39; *Shing Wai Brass*, 190 S.W.3d at 746. Further, because the Zaffirini Lessors' have no surviving tort claims against BP, they are not entitled on remand to any consideration of exemplary damages against BP. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006) (noting that exemplary damages may be available for tort claims but are not available for breach of contract); *accord Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986).

### C.  Jones Lessors' Contract, Tort Claims Against BP

In their traditional motion and counterclaim, the Jones Lessors claimed BP breached the lease, acted fraudulently, committed gross negligence, and owes them additional damages under lease section 36.14. In return, BP filed a no-evidence motion that challenged the Jones Lessors' claims. To avoid having their claims dismissed, the Jones Lessors had to (1) file a response that raised a genuine issue of material fact on each challenged element and (2) have that response considered by the trial court. *See Landers*, 257 S.W.3d at 746; *cf. Neimes*, 985 S.W.2d at 138.

#### 1.  *Jones Lessors' Response*

The Zaffirini Lessors timely filed a response to BP's no-evidence motion. On the day of the hearing, the Jones Lessors filed two motions for leave: one for another purpose not relevant here, and a second for leave to adopt and incorporate the Zaffirini Lessors' responses as their own. The appellate record shows the trial court granted one of the motions for leave, but does not show the trial court granted the Jones Lessors' motion for leave to adopt the Zaffirini Lessors' responses. *Cf. Crowder*, 919 S.W.2d at 663; *Neimes*, 985 S.W.2d at 138.

*2. Adopted Response Fails*

Assuming *arguendo* that the trial court granted the Jones Lessors' motion and considered the adopted response, the result for the Jones Lessors is the same. As we have already decided, the Zaffirini Lessors' response failed to meet its burden to defend its claims against BP's no-evidence motion. The Jones Lessors' claims were the same as the Zaffirini Lessors' claims. Therefore, even applying the adopted Zaffirini Lessors' response, BP was entitled to summary judgment on its no-evidence challenges against all of the Jones Lessors' claims.

The trial court erred by granting the Jones Lessors' traditional motion for breach of contract and by denying BP's corresponding no-evidence motion.

**D. Disposition of Lessors' Claims, BP's Responses**

BP was entitled to summary judgment on its no-evidence challenges to the Zaffirini Lessors' and Jones Lessors' claims for breach of contract and associated attorney's fees, additional damages under section 36.14, fraud, and gross negligence. We sustain BP's issues three, four, five, and seven.

**ATTORNEY DISQUALIFICATION**

BP contends that attorneys Carlos M. Zaffirini Sr. and James K. Jones Jr. violated the lawyer–witness rule by representing clients in this case because each one's testimony is necessary to establish essential facts on behalf of his clients. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.08(a), *reprinted in* TEX. GOV'T CODE ANN. tit. 2, subtit. G, app. A (West 2005) (TEX. STATE BAR R. art. X, § 9). BP moved to disqualify Zaffirini and Jones on June 27, 2011, three days before the hearing on the motions for summary judgment. BP asserts that it believed Zaffirini was appearing only *pro se* until it learned otherwise on April 20, 2011. Likewise, BP asserts that it first learned on June 8, 2011, that Jones was representing a client in this case. BP admits it waived

its disqualification complaint as to Jones, but complains that the trial court should not have denied its motion to disqualify Zaffirini.

## A. Standard of Review

We review a trial court's decision on a motion to disqualify an attorney using an abuse of discretion standard. *See In re Sanders*, 153 S.W.3d 54, 57 (Tex. 2004) (orig. proceeding) (per curiam); *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding). A trial court acts within its discretion when it correctly applies the applicable law and its decision is not unreasonable, arbitrary, or made "without any reference to guiding rules or principles." *See In re Meador*, 968 S.W.2d 346, 353 (Tex. 1998) (orig. proceeding); *Spears*, 797 S.W.2d at 656. This court "may not reverse for abuse of discretion merely because it disagrees with a decision by the trial court, if that decision was within the trial court's discretionary authority." *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *see also Nat'l Med. Enters., Inc. v. Godbey*, 924 S.W.2d 123, 135 (Tex. 1996) (orig. proceeding) (Baker, J., joined by Enoch, J., dissenting); *Ghidoni v. Stone Oak, Inc.*, 966 S.W.2d 573, 579 (Tex. App.—San Antonio 1998, pet. denied) (op. on reh'g).

## B. Applicable Law

With a few exceptions, the lawyer–witness rule prohibits a lawyer from representing a client in court "if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client." TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.08(a). One remedy for violation of a disciplinary rule is to disqualify the attorney. *In re Sanders*, 153 S.W.3d at 57. A party who seeks to disqualify opposing counsel has the burden to "establish with specificity a violation of one or more of the disciplinary rules." *Spears*, 797 S.W.2d at 656. Further, "[a] party who fails to file its motion to disqualify opposing counsel in a timely manner waives the complaint." *In re EPIC Holdings, Inc.*, 985 S.W.2d 41, 52 (Tex. 1998)

(orig. proceeding) (alteration in original) (quoting *Vaughan v. Walther*, 875 S.W.2d 690 (Tex. 1994) (orig. proceeding) (per curiam)) (internal quotation marks omitted).  In considering the timeliness of the motion, the court considers, *inter alia*, the length of time between when the conflict was apparent and when the motion was filed.  *See Vaughan*, 875 S.W.2d at 690–91; *Wasserman v. Black*, 910 S.W.2d 564, 568 (Tex. App.—Waco 1995, orig. proceeding).

## C. Timeliness of Disqualification Motion

In BP's original petition filed on May 7, 2010, BP sued Zaffirini, six other individuals, and Las Tinajas Minerals, Ltd.  On June 4, 2010, Carlos M. Zaffirini, Sr. filed a *pro se* original answer, and the other Zaffirini Lessors filed an original answer that was signed by attorney Guadalupe Castillo, Zaffirini's law practice partner.  At a November 29, 2010 hearing on BP's motion for continuance, Donato Ramos Jr., one of BP's attorneys, told the court that Zaffirini and Jones were "plaintiffs in addition to being counsel."  Ramos Jr. also told the court that "[t]here was a Favored[-]Nations Clause in Mr. Zaffirini's clients['] oil and gas lease."  Ramos Jr. heard Jones complain to the court about BP's planned depositions "especially when a bunch of our clients didn't even go to any of the negotiations."

BP first moved to disqualify Zaffirini and Jones on June 27, 2011, three days before the summary-judgment hearing, and almost seven months after the hearing in which BP's counsel stated that Zaffirini was representing clients and heard that Jones was likewise representing others in the suit.  *See Vaughan*, 875 S.W.2d at 690–91 (holding that party waived disqualification complaint by filing her motion six and one-half months after learning of the potential conflict); *In re Davila*, 04-99-00571-CV, 1999 WL 735164, at *3 (Tex. App.—San Antonio Sept. 22, 1999, orig. proceeding) (concluding that petitioner waived its disqualification complaint filed seven days before the hearing and after "an unexplained four month delay").  BP explained its delay in filing

the motions to disqualify by stating it did not know until April 20, 2011, for Zaffirini and June 8, 2011, for Jones, that they were representing others in this case.

## D. Attorney Disqualification Waived

Considering (1) the almost seven months period between when the conflict was apparent until BP filed its motions to disqualify Zaffirini and Jones, (2) BP's explanation for the delay, and (3) BP's filing the motions three days before the hearing, we cannot say the trial court abused its discretion in denying BP's motion to disqualify Zaffirini and Jones and in denying BP's motions to strike Zaffirini's and Jones's affidavits. *See Vaughan*, 875 S.W.2d at 690–91; *In re Davila*, 1999 WL 735164, at *3. We overrule BP's issue six.

## CONCLUSION

BP argues the Zaffirini lease is unambiguous and supports their position that the entire $1,750 per acre payment is bonus; we agree. The plain language of the lease and the circumstances surrounding the lease negotiations show that the lease unambiguously expresses the parties' intent that the cash consideration to execute the lease is an unallocated $1,750 per acre, and such cash consideration is bonus as a matter of law. *See Hous. Exploration Co.*, 352 S.W.3d at 469–70; *Heritage Res.*, 939 S.W.2d at 121; *Coker*, 650 S.W.2d at 393. It is undisputed that BP paid Lessors $1,750 per acre, and we declare that (1) the entire amount was bonus, (2) BP did not breach the lease agreement by failing to pay Lessors an additional $450 per acre, (3) Lessors are not entitled to attorney's fees for breach of contract, (4) BP does not owe Lessors any additional bonus payment, and (5) BP is the prevailing party in the declaratory-judgment action.

With respect to BP's fraud claims against Lessors, we conclude that neither BP nor Lessors were entitled to summary judgment on BP's fraud, fraudulent inducement, and fraud by nondisclosure claims. However, as a matter of law, BP could not pursue its promissory-estoppel cause of action against Lessors because the promise it sought to enforce was embodied in the lease.

As we have explained, BP was entitled to judgment on its no-evidence motion against the Zaffirini Lessors' and Jones' Lessors' causes of action for breach of contract, breach of contractual duty of good faith and fair dealing, fraud, gross negligence, and additional damages under lease section 36.14, and against the Zaffirini Lessors' affirmative defenses of estoppel, promissory estoppel, quasi-estoppel, failure to use due diligence, disclaimer, waiver, acquiescence, and release.

Accordingly, we sustain BP's issues one, three, four, five, and seven; BP's second issue is moot; and we overrule BP's issue six. We affirm the trial court's judgment in part, reverse it in part, and remand the cause to the trial court for further proceedings consistent with this opinion. We tax court costs for trial and appeal against Lessors.

Patricia O. Alvarez, Justice